**WHITE HOUSE VIGIL FOR the ERA COMMITTEE, et al., Appellees,**

v.

**William P. CLARK, Secretary of the Interior, et al., Appellants.**

**No. 84–5271.**

United States Court of Appeals, District of Columbia Circuit.

Argued 25 July 1984.

Decided 26 Oct. 1984.

Wald, Circuit Judge, concurred in part, dissented in part, and filed an opinion.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Mitchell R. Berger, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellants.

John Vanderstar, Washington, D.C., with whom Lyle Jeffrey Pash, David H. Remes, Arthur B. Spitzer, Elizabeth Symonds, Washington, D.C., and Sebastian K.D. Graber, Alexandria, Va., were on the brief, for appellees, Beall, et al.

Lena S. Zezulin, Washington, D.C., with whom Thomas J. Hart, Washington, D.C., was on the brief, for appellee, Nat. Organization for Women.

Before WILKEY, WALD and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion concurring in the judgment in part and dissenting in part filed by Circuit Judge WALD.

WILKEY, Circuit Judge:

This appeal concerns the constitutional validity of regulations promulgated by the

National Park Service to restrict demonstrations and other activities on the sidewalk directly in front of the White House. The district court struck down most of the regulations, and modified the others, in an unpublished opinion of 26 April 1984. On appeal the plaintiff-appellees and intervenors contend that the district court's findings are not "clearly erroneous," and that this court should defer to those findings in what is essentially a factual dispute. The government, as defendant-appellant, urges reinstatement of the original regulations. It defends the regulations as reasonable time, place and manner restrictions which further substantial governmental interests, most notably the security of the President and the aesthetics of the White House view. We agree with the latter position and uphold the regulations as originally written.

The restrictions embodied in the regulations are of three types. The first set governs the size, construction, and placement of signs on the White House sidewalk. The primary purpose of the sign restrictions is to prevent signs from being used as weapons, as concealment for explosives, or as a means of breaching the White House fence. In light of recent Supreme Court cases which clarify the role of judicial review in the first amendment context, we conclude that the sign restrictions are reasonable as originally drafted. A second type of regulation restricts, but does not prohibit, demonstrations within the "center zone" of the sidewalk. We conclude that this restriction, too, is constitutional as a reasonable means of regulating the place of demonstrations. The government's interest in preserving a relatively unobstructed view of the White House for tourists and passersby constitutes a legitimate aesthetic goal which is not outweighed by the insubstantial infringement on the demonstrators' ability to engage in expressive activities. Moreover, while unrestricted access to the center zone might provide demonstrators with optimal media exposure, appellees have no first amendment *right* to such exposure. The third type of regulation prohibits the placing of parcels, except momentarily, on the sidewalk. Such activity has no expressive content; at most, it may be said to facilitate expression. It is unclear whether the facilitative activity proscribed here implicates the first amendment. Even if it does, however, the parcels restriction is constitutional as a reasonable restriction on the manner in which speech may be exercised: it is narrowly tailored to prevent the concealment of explosive devices within parcels left unattended on the sidewalk.

## I. Background

In late 1982 representatives of the National Park Service, the Park Police, the Secret Service and the Department of Justice met to consider ways of protecting the White House and its occupants from terrorist attack.[1] The need for increased presidential security had been tragically illustrated by the events of 8 December 1982, when Norman Mayer, a regular protestor on the White House sidewalk, was killed by police officers after threatening to blow up the Washington Monument.[2] While the agencies reviewed existing regulations and drafted new ones,[3] terrorist activity continued at an alarming rate both at home [4] and abroad.[5]

---

1. Robbins Tr. at 6–8, 12.

2. *See* 48 Fed.Reg. 28058, 28058 (1983); N.Y. Times, 9 Dec. 1982, at A1, col. 1.

3. The agencies initially considered a non-regulatory approach, Parr Tr. at 17, 20–22; J.A. 210–11, but rejected it because it did not adequately address security concerns, *id.*; Robbins Tr. at 18–22, 69–70.

4. *See* 48 Fed.Reg. at 28058. On 23 April 1983, a ground-floor office in the Department of Justice building was firebombed. N.Y. Times, 25 Apr.

1983, at A1, col. 2. Three days later, a bomb concealed in a flowerpot exploded on the front steps of the National War College at Fort McNair. *Id.*, 27 Apr. 1983, at A18, col. 4. On 18 October 1983, security officers at the Capitol apprehended a visitor to the House gallery who had concealed a homemade bomb under his shirt. *Id.*, 2 Nov. 1983, at A22, col. 1. Less than a month later, a terrorist bomb exploded on the Senate side of the Capitol. *Id.*, 8 Nov. 1983, at A1, col. 3.

The recent terrorist incidents have sparked increased concern for the protection of federal

The National Park Service published interim regulations on 22 April 1983;[6] they were to become effective immediately.[7] The regulations required that signs and placards displayed on the White House sidewalk[8] be hand-held by individuals.[9] In addition, they prohibited the deposit of parcels on the sidewalk for longer than one hour and provided that parcels placed on the sidewalk were subject to inspection by police officers.[10]

On 27 April officers of the United States Park Police arrested three long-time protestors on the White House sidewalk[11] for failing to comply with the interim regulations. Those arrested, along with other regular White House demonstrators, filed suit in U.S. District Court two days later seeking declaratory and injunctive relief on the ground that the regulations infringed

their first amendment rights of free expression.[12] Following an evidentiary hearing on plaintiffs' motion for a temporary restraining order, Judge William B. Bryant concluded that the Park Service had failed to show "good cause" for dispensing with the notice and comment requirements of the Administrative Procedure Act[13] when it issued the interim regulations.[14] He enjoined enforcement of the regulations pending publication of a final rule.[15]

The Park Service complied immediately. It republished the regulations as a proposed rulemaking on 17 May 1983, with a public comment period extending to 31 May.[16] The Service received fifteen comments, seven of which supported the regulations as proposed and eight of which opposed some portion of them.[17] The Service studied the comments, modified its interim regulations and published a "final rule" on

buildings in Washington. Extensive security measures have been instituted at the Capitol in response to the November 1983 bombing. *See* N.Y. Times, 21 Jan. 1984, at 19, col. 1 (bulletproof steel plates installed in Members' chairs on House floor); Wash. Post, 6 Jan. 1984, at A4, col. 1 (concrete barriers and new metal detectors); N.Y. Times, 9 Nov. 1983, at A1, col. 4 (new security regulations). Officials have taken similar steps to secure the State Department building, *id.*, 18 Dec. 1983, § IV, at 1, col. 1 (concrete barriers), and the Pentagon, *id.*, 21 July 1984, at 19, col. 2 (metal detectors); *id.*, 17 Dec. 1983, at 9, col. 1 (closing of traffic tunnels under Pentagon).

The regulations challenged here are but one of a number of security measures recently taken to protect the White House and its occupants. Visitors who wish to tour the Mansion must now pass through a "garden pavillion," where they are checked for guns and other weapons. *Id.*, 18 Mar. 1983, at A15, col. 2; *see also id.*, 17 Mar. 1984, at 12, col. 5 (new security measures for visitors and press). Workers have erected concrete barriers along the White House sidewalk to prevent "truck bombings" of the type that destroyed American installations in Lebanon. *Id.*, 4 Jan. 1984, at B6, col. 2; *id.*, 22 Dec. 1983, at A12, col. 1; *id.*, 4 Dec. 1983, § I, at 31, col. 1.

5. *See* 48 Fed.Reg. at 28058.

6. 48 Fed.Reg. 17352 (1983).

7. *Id.* at 17352. The interim regulations provided for public comment until 23 May 1983. *Id.*

8. The White House sidewalk is defined as "the south sidewalk of Pennsylvania Avenue, N.W., between East and West Executive Avenues, NW." 36 C.F.R. § 50.19(a)(5) (1983).

9. 48 Fed.Reg. 17352 (1983).

10. *Id.*

11. The three were Edward Saffron, Conception Picciotto, and Robert Dorrough.

12. Complaint for Declaratory Judgment and Injunctive Relief, *reprinted in* J.A. at 16–25. The National Organization for Women later intervened. *White House Vigil for the ERA Comm. v. Watt*, No. 83–1243 (D.D.C. 27 July 1983).

13. 5 U.S.C. § 553(b)(B) (1982). *See generally* Jordan, *The Administrative Procedure Act's "Good Cause" Exemption*, 36 AD.L.REV. 113 (1984) (surveying cases).

14. *White House Vigil for the ERA Comm. v. Watt*, No. 83–1243 (D.D.C. 3 May 1983).

15. *Id.* Judge Bryant later extended the injunction to 23 May 1983. *White House Vigil for the ERA Comm. v. Watt*, No. 83–1243 (D.D.C. 10 May 1983).

16. 48 Fed.Reg. 22284 (1983) (proposed 17 May 1983).

17. 48 Fed.Reg. 28058, 28059 (1983).

17 June 1983.[18] The plaintiffs amended their complaint seven days later to take account of the new provisions.[19]

The regulations impose three types of restrictions on activities conducted on the White House sidewalk. The first set of provisions governs the construction, size and placement of signs carried by demonstrators and other individuals. Signs must be constructed of cardboard, posterboard or cloth, while sign supports must be made of wood.[20] Signs can be no larger than three feet in height,[21] twenty feet in length, and one-quarter inch in thickness, while sign supports must have cross-sectional dimensions of no greater than three-quarters of an inch.[22] All signs on the sidewalk must be "attended," a requirement which is met only if the sign is in physical contact with a person.[23] Stationary signs may be no closer than three feet to the White House fence,[24] and no sign may be leaned against or attached to the fence or other structure on the sidewalk.[25]

A second type of restriction concerns the "center zone," an area defined as the central twenty yards of the sidewalk.[26] Within the center zone, signs may not be held, placed or set down, but "individuals may demonstrate while carrying signs ... if they continue to move along the sidewalk." [27]

The third type of restriction prohibits the deposit of parcels and other property on the ground. An exception is made for items which are "momentarily placed or set down in the immediate presence of the owner." [28]

The Park Service prefaced its final regulations with a concise explanation of the governmental interests they were designed to serve. Those interests were threefold: "to minimize potential threats to the [White House] and its occupants and visitors ... to provide opportunities to the visitor to view the White House, and to maintain the free flow of pedestrian and emergency traffic." [29] The Service described in detail the manner in which its regulations were designed to accomplish those ends; in doing so, it relied on its own experience as

18. 48 Fed.Reg. 28058 (1983). The regulations are codified at 36 C.F.R. §§ 50.7(h)(2), 50.19(e)(9)–(10) (1983). In its preamble to the regulations, the Park Service stated that "[t]he need to address immediate security concerns in the White House area" constituted "good cause" for dispensing with the thirty-day delay period normally required before a new rule can become effective. 48 Fed.Reg. at 28058–59; see 5 U.S.C. § 553(d)(3) (1982) (good cause exception to thirty day delay requirement). The Park Service set 5 July as the date on which the regulations would become effective. Upon challenge by the plaintiffs, the district court held that the government had failed to substantiate its determination that good cause existed. *White House Vigil for the ERA Comm. v. Watt*, No. 83–1243 (D.D.C. 1 July 1983). In two successive temporary restraining orders, the court enjoined enforcement of the regulations until 17 July. *Id.; White House Vigil for the ERA Comm. v. Watt*, No. 83–1243 (D.D.C. 8 July 1983).

19. Amended Complaint for Declaratory Judgment and Injunctive Relief, *reprinted in* J.A. at 31–38.

20. 36 C.F.R. § 50.19(e)(9) (1983).

21. The regulation uses the term "width," *id.*, but it is obvious that the reference is to the vertical dimension.

22. *Id.*

23. *Id.*

24. *Id.* The three foot mark is readily identifiable because the pavement joints in the sidewalk occur every one and one-half feet from the fence. 48 Fed.Reg. at 28061. The second joint, therefore, marks the line established by the regulation.

25. 36 C.F.R. § 50.19(e)(9) (1983).

26. *Id.* ("ten yards on either side of the center point"). Unlike the three foot zone, *see supra* note 24, the center zone does not appear to be demarcated by actual landmarks on the sidewalk.

27. 36 C.F.R. § 50.19(e)(9) (1983). In short, the regulations prohibit stationary, but not moving, protest within the center zone.

28. 36 C.F.R. §§ 50.7(h)(2), 50.19(e)(10) (1983). Sections 50.7(h)(2) and 50.19(e)(10) are substantively identical.

29. 48 Fed.Reg. at 28058.

well as that of other federal agencies charged with the protection of the White House and its grounds. The Park Service discussed at length the objections which various commentators had registered to the interim regulations, and it noted modifications which it had made in the regulations to take account of criticisms it found valid.

Following an evidentiary hearing the district court entered a preliminary injunction against enforcement of many of the restrictions on 19 July 1983.[30] In the court's view, "the governmental interests served by the regulations could be attained through alternative means which are less intrusive on first amendment freedoms."[31] The court proceeded to "finetune" the regulations: not only did it uphold some restrictions and reject others, it modified the content of individual provisions by substituting its factual judgment for that of the agency. The court approved the twenty foot limit on the length of signs, but created a special exception for those held parallel to the fence.[32] It endorsed the concept of restricting sign and parcel placement, but held that the "physical contact" requirement for signs and the prohibition on

parcel placement were unnecessarily restrictive.[33] In their place, the court fashioned a rule which allowed signs and parcels to be placed on the sidewalk if they were "attended at all times," with "attendance" defined to mean "in the immediate presence of the owner."[34] The court approved without modification only three provisions: the restriction on sign materials,[35] the center zone restriction,[36] and the absolute prohibition on the placement of *structures* on the sidewalk.[37]

The government appealed the district court's order, and its appeal was heard on an expedited basis. In a brief *per curiam* opinion this court modified the preliminary injunction to take greater account of the government's interest in presidential security.[38] It noted that review of a preliminary injunction ordinarily proceeds under the abuse-of-discretion standard,[39] but that an appellate court has greater authority to modify such an injunction where the security of the President is at stake.[40] The modifications which this court undertook to make, however, were of the same genre as those which the district court itself had

---

30. *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243 (D.D.C. 19 July 1983) (order).

31. *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243, slip op. at 14 (D.D.C. 19 July 1983).

32. *Id.* at 20.

33. *Id.* at 17–18.

34. *Id.* The regulation bars the placement of parcels on the sidewalk except "momentarily ... in the immediate presence of the owner." 36 C.F.R. §§ 50.7(h)(2), 50.19(e)(10) (1983). The substantive effect of the district court's order was to delete the word "momentarily" from the regulation. As a practical matter this is a change of significance. Guards can at once spot a package on the sidewalk. If it is not immediately picked up by its purported owner, under the original regulation the guards can move to seize it. Under the district court's modification, the guards have no right to inspect or seize a parcel on the sidewalk; ten minutes after depositing it, the "owner" may be impossible to identify among the shifting crowds on the sidewalk. In a worst case scenario, the "owner" may be some distance away, running for his life. This

is but one of many possible examples of why security experts are experts and judges are not.

35. *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243, slip op. at 16 (D.D.C. 19 July 1983).

36. *Id.* at 20–21.

37. *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243 (D.D.C. 19 July 1983) (order). The prohibition of structures is a part of the parcels restriction.

38. *White House Vigil for the ERA Comm. v. Watt,* 717 F.2d 568 (D.C.Cir.1983) (per curiam).

39. *Id.* at 571; *see Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975).

40. *White House Vigil,* 717 F.2d at 572 ("[W]here the security of the President is involved, our decisions have established that we may modify a preliminary injunction in extreme circumstances even when there has been no abuse of discretion below."); *see A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1118–19 (D.C.Cir.1969).

made earlier.[41] An "attended" sign was now defined as one "within three feet of the person responsible for controlling it";[42] no explanation was given for the arbitrary three-foot figure and no attempt was made to define "control." Signs could be leaned against, or placed within three feet of, the White House fence, but the district court was instructed to set a limit "as to the size, number, and spacing" of such signs.[43] Hollow metal tubes were to be permitted as sign supports, but only if their ends were "permanently secured."[44] The parcels restriction was allowed to stand, but plaintiffs were permitted to request an exemption for "a reasonable inventory of pamphlets, leaflets and similar writings."[45]

This court's modifications only applied to the preliminary injunction; they did not preclude *de novo* consideration of the merits.[46] On 23 August the district court modified its order to take account of this court's decision and set the case for trial on an expedited basis.[47]

At trial the court heard testimony from more than twenty witnesses. Among those who testified for the government were several Secret Service and Park Police officials with special expertise in the field of White House security.[48] Those officials testified at length as to the security rationales underlying each regulation; they emphasized the need to anticipate ingenious and unprecedented forms of terrorism.

On 26 April 1984, the district court issued the decision and order appealed from

**41.** This court ordered the district court to modify its preliminary injunction in the following respects:

(1) A limit shall be set as to the size, number, and spacing of signs leaned against the White House fence or ledge, or placed in a stationary position within three feet of the fence, at any one time to the extent reasonably necessary to permit surveillance of both sides of the signs by a combination of officers stationed inside and outside the White House fence;

(2) Any sign or placard placed on the White House sidewalk, leaned against the White House fence, or placed upon or leaned against the ledge, shall be attended at all times by being within three feet of the person responsible for controlling it;

(3) Any sign support or frame made of hollow metal tubing shall be permanently secured at both ends in a manner which will prevent the insertion of any object into the tubing or the ejection of any object from the tubing;

(4) The regulations in 36 C.F.R. §§ 50.-19(e)(10) and 50.7(h)(2) pertaining to the placement or storage of parcels, containers, packages, bundles or other property on the White House sidewalk may be enforced. Any such enforcement shall be without distinction between demonstrators and others, and without prejudice to consideration by the District Court on remand of this Order, or in the plenary trial, of a claim for an exception to these requirements for the benefit of any plaintiff claiming a right to have on the White House sidewalk under the immediate physical control of that plaintiff a reasonable inventory of pamphlets, leaflets and similar writings for distribution there.

717 F.2d at 569–70.

**42.** *Id.* at 569, 572.

**43.** *Id.*

**44.** *Id.*

**45.** *Id.* at 569–70; *see id.* at 573.

**46.** *Id.* at 570, 573. Nor do they constitute the law of the case. *See United States v. United States Smelting Refining & Mining Co.,* 339 U.S. 186, 198–99, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950); *Lewis v. Creasey Corp.,* 198 Ky. 409, 413, 248 S.W. 1046, 1048 (1923).

**47.** *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243 (D.D.C. 23 Aug. 1983). The district court originally set 20 September as the trial date. *Id.* Appellees indicated to the court that they would not be able to prepare for trial on such short notice. The court refused to grant an extension of time unless appellees agreed to the vacating of the preliminary injunction. Over intervenor NOW's objections, appellees agreed "with great reluctance" to the arrangement. Motion to Vacate Preliminary Injunction and to Reschedule Trial, *reprinted in* J.A. at 113–15. The district court set 6 December as the new trial date. *White House Vigil for the ERA Comm. v. Watt,* No. 83–1243 (D.D.C. 2 Sept. 1983).

**48.** They included Jerry S. Parr, the Assistant Director of the Office of Protective Research, United States Secret Service; Edward P. Walsh, the Deputy Assistant Director of the same office; John B. Flinn, Chief of the Munitions Countermeasures Section, Technical Security Division

here.[49] It invalidated virtually all of the restrictions on the ground that they did not advance the government's interest in security. In order to prevail, the court wrote, "the government must show at least a *probable danger* to the security of the President and the White House created by the plaintiffs' activities. That is to say, it must establish a nexus between the activity it would proscribe and a threat to presidential security." [50] The court found that the demonstrators' activities posed no *direct* threat to the safety of the President.[51] Despite the fact that "security measures should be predicated on a 'better safe than sorry' premise," [52] the court described the challenged regulations as "totally ineffective" and "demonstrably too restrictive." [53] Its analysis of individual provisions was equally conclusory. The ban on wooden signs was "unjustified," and any testimony to the contrary was "incredible." [54] The requirement that protestors maintain physical contact with their signs, and the prohibition on stationary signs within three feet of the fence, was "oppressive." [55] The government's fear that terrorists might

conceal explosives or rockets inside hollow metal supports was "grossly exaggerated." [56] The center zone restriction was "not justified on any score," [57] while a flat ban on the deposit of parcels was "clearly overbroad and unreasonable." [58]

Having concluded that the regulations as originally written were in violation of the first amendment,[59] the district court proceeded to reject some provisions and to rewrite others. The government had argued that "[*United States v.*] *O'Brien* [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)] does not contemplate ad hoc regulatory supervision by the courts over the details of an administrative scheme, and that in fact, the Supreme Court has warned that '[t]he logic of ... elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all [regulatory] powers' (*United States v. Martinez-Fuerte,* 428 U.S. 543, 557, n. 12, 96 S.Ct. 3074, 3082, n. 12, 49 L.Ed.2d 1116 (1976)." [60] The district court rejected the applicability of *Martinez-Fuerte.* Because that case dealt with the fourth amendment's protection against un-

of the same office; and James C. Lindsey, Deputy Chief (Operations) of the Park Police.

**49.** *White House Vigil for the ERA Comm. v. Clark,* No. 83–1243 (D.D.C. 26 Apr. 1984).

**50.** *Id.,* slip op. at 18 (emphasis in original).

**51.** *Id.* at 20–21.

**52.** *Id.* at 21.

**53.** *Id.*

**54.** *Id.* at 23.

**55.** *Id.* at 24.

**56.** *Id.*

**57.** *Id.* at 25. The court's characterization of the center zone restriction was directly at odds with its earlier discussion of the provision. In its opinion of 19 July 1983, the court had noted that
> [t]he defendants have been somewhat timid in advancing aesthetic considerations to support the regulations. However, the court has no difficulty in accepting that such considera-

tions are legitimate: visitors to the Nation's Capital are entitled to a clear view of the sights they come from such great distances to see. The court accordingly finds no objection to the special restrictions which the regulations place on the use of the central portion of the sidewalk. The court agrees with the defendants that a 20-yard restricted zone is not unreasonable given that the total length of the sidewalk exceeds 700 feet.

*White House Vigil for the ERA Comm. v. Watt,* No. 83–1243, slip op. at 20–21 (D.D.C. 19 July 1983).

**58.** *White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 26 (D.D.C. 26 Apr. 1984).

**59.** The specific first amendment right relied upon by the district court was not the free speech guarantee, but rather the right of petition and assembly. *Id.* at 19; *see* U.S. CONST. amend. I ("Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

**60.** Defendant's Post-Trial Brief at 66, *quoted in White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 19 (D.D.C. 26 Apr. 1984).

reasonable searches and seizures, the court concluded that it did not state the standard of judicial scrutiny to be applied in first amendment cases. As a matter of "constitutional necessity," courts should engage in a much more stringent review of governmental action when first amendment interests are at stake.[61]

The court permanently enjoined the enforcement of every provision as written except for the one-quarter inch limitation on the thickness of signs.[62] The requirement that signs be attended and the restriction on the deposit of parcels also survived, but in significantly different form from that which the agency had adopted. Signs were considered "attended" when they were within five feet of the person controlling them.[63] Parcels were permitted on the sidewalk when they were within the "immediate presence" of the owner; the same five-foot rule was to be applied in determining "immediate presence."[64]

The government appealed to this court. While the case was pending and before oral argument the Supreme Court decided two cases of major import for the reasonable restriction of free speech within public fora.[65] It is primarily our responsibility on this appeal to determine what significance these and other recent Supreme Court decisions have for the regulation of demonstrations on the White House sidewalk.

## II. THE LEGAL STANDARD

Certain types of places are so vital to a healthy and robust public discourse that they are accorded special status under the first amendment. The government cannot constitutionally prohibit all expressive activities in these public fora;[66] access to them is a small but invaluable part of every American's heritage.

The public sidewalk here is one such forum.[67] Sidewalks, like streets and parks, are places whose title has "immemorially been held in trust for the use of the public."[68] As such, they occupy a privileged

**61.** White House Vigil, slip op. at 19.

**62.** White House Vigil for the ERA Comm. v. Clark, No. 83–1243 (D.D.C. 26 Apr. 1984) (order).

**63.** Id.

**64.** Id.

**65.** Regan v. Time, Inc., —— U.S. ——, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); Clark v. Community for Creative Non-Violence, —— U.S. ——, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

**66.** See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The classic statement of the public forum doctrine is found in Justice Roberts's opinion in Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939):

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

307 U.S. at 515–16, 59 S.Ct. at 964.

While the government may not prohibit all communicative activity in a public forum, it may enforce a content-based exclusion if the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. at 954. The government has not attempted to impose such an exclusion in the present case.

**67.** See A Quaker Action Group v. Morton, 516 F.2d 717, 724–25 (D.C.Cir.1975); cf. United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (sidewalk in front of Supreme Court, like other public sidewalks, is a public forum).

**68.** Hague v. CIO, 307 U.S. at 515, 59 S.Ct. at 964; see United States v. Grace, 103 S.Ct. at 1708.

position in the hierarchy of first amendment jurisprudence.[69]

The government is not precluded, however, from *regulating* expressive activities conducted on the White House sidewalk.[70] It may adopt reasonable "time, place and manner" restrictions on the exercise of free speech, so long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication.[71]

The regulations challenged here are clearly not based "upon either the content or subject matter of speech."[72] There is nothing in the text or the history of the regulations to suggest that one group's viewpoint is to be preferred at the expense of others. They meet the test of being content-neutral. Appellees contend that the Park Service has *applied* the regulations in a discriminatory fashion, favoring demonstrators who espouse Administration views and disfavoring those with contrary positions, but we find the evidence for such discrimination speculative and unpersuasive. The government has offered cogent explanations for the handful of instances in which the regulations were applied unevenly; we conclude that those aberrations were the product of happenstance and unavoidable circumstances rather than of improper motives. Needless to say, no court will tolerate any attempt to discriminate among protestors on the basis of viewpoint or subject matter.

Nor do we believe that the purpose underlying the regulations was to ban speech entirely. Appellees direct our attention to a memorandum, dated 13 January 1983, from then-Secretary of the Interior James Watt to an aide, Moody Tidwell. Watt requested "a briefing on the regulations that allow demonstrations and protestors in Lafayette Park and in front of the White House on Pennsylvania Avenue. My intention is to prohibit such activities and require that they take place on the Ellipse."[73] In March 1983 Watt received a briefing from the principal drafter of the new regulations and told him to "keep up the good work."[74]

On the circumstances existing during the relevant time here, a strong argument could have been made that a regulation banning all demonstrations on the White House sidewalk and in Lafayette Park would have been unconstitutional.[75] But the institution of a total ban is not the approach the Park Service took; indeed, it is one the Service explicitly *rejected*. In its preamble to the final regulations, the Service stated that "legal precedent in the District of Columbia Circuit would prevent prohibiting demonstrations altogether on the White House sidewalk."[76] More relevant now may be recent precedent in the Supreme Court,[77] but, whether currently accurate as a statement of law or not, this is but one of several indications that the Park Service dealt with constitutional values with scrupulous care.

**69.** *United States v. Grace,* 103 S.Ct. at 1708.

**70.** *Hague v. CIO,* 307 U.S. at 515–16, 59 S.Ct. at 964.

**71.** *See Regan v. Time,* 104 S.Ct. at 3266–67; *Clark v. Community for Creative Non-Violence,* —— U.S. ——, 104 S.Ct. at 3069; *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); *United States v. Grace,* 103 S.Ct. at 1707; *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954; *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

**72.** *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980).

**73.** Note from James G. Watt to Moody Tidwell (13 Jan. 1983), *reprinted in* J.A. at 174.

**74.** Robbins Tr. at 112.

**75.** *See supra* note 66.

**76.** 48 Fed.Reg. 28058, 28061 (1983).

**77.** *See Regan v. Time,* 104 S.Ct. 3262; *Clark v. Community for Creative Non-Violence,* 104 S.Ct. 3065; *Taxpayers for Vincent,* 104 S.Ct. 2118.

The regulations also clearly satisfy the constitutional requirement that they leave open ample alternative channels of communication. Demonstrators on the sidewalk are free to engage in a rich variety of expressive activities: they may picket, march, hand out leaflets, carry signs, sing, shout, chant, perform dramatic presentations, solicit signatures for petitions, and appeal to passersby. The content of the message they espouse is theirs and theirs alone; they may express views and employ verbal formulae that would be punished as seditious libel, blasphemy or obscenity in less free societies. Although they may not engage in *stationary* protest within the center zone of the sidewalk, they are in no way precluded from engaging in other forms of expression there, and they may stand still on the remaining 93% of the sidewalk. Should they find the government's regulations too restrictive they may always carry their demonstration immediately across Pennsylvania Avenue to Lafayette Park. In short, the regulations leave unaffected a multitude of possibilities for meaningful protest on the sidewalk and within a few yards in adjoining areas.

The regulations also clearly serve a "substantial governmental interest." No one can deny the substantiality or the significance of America's interest in presidential security.[78] At stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world. Nor is the interest in pedestrian safety and traffic insubstantial; the value of sidewalks as public fora would be considerably vitiated were the state unable to provide for the orderly passage of those persons who use them.[79] Finally, the government has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of governmental regulation.[80]

As in most "time, place and manner" cases, the decisive inquiry here is as to the requisite narrowness of the means employed by the government to advance its substantial interests.[81] Appellees contend that this is primarily a factual matter, and that an appellate court should refrain from overturning the decision of the trial court unless that decision is "clearly erroneous."[82] Furthermore, appellees suggest that a trial court has the power to substitute its factual judgment for that of an agency where the agency has chosen not to adopt the "least restrictive" regulatory alternative.

We reject both contentions. The issue for decision on this appeal is not factual, it

---

**78.** *See, e.g., Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969); *White House Vigil for the ERA Comm. v. Watt,* 717 F.2d 568, 570, 572 (D.C.Cir.1983) (per curiam); *A Quaker Action Group v. Morton,* 516 F.2d at 729; *A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1117 (D.C.Cir.1969).

**79.** *See Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Cox v. New Hampshire,* 312 U.S. 569, 574, 576, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

**80.** *See Taxpayers for Vincent,* 104 S.Ct. at 2129–30; *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507–08, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

**81.** We feel constrained to point out an ambiguity in the Supreme Court's latest formulation of the "time, place and manner" test. In *Regan v. Time,* the Court recited the standard requirements of content-neutrality and alternative channels of communication, but stated only that a regulation "must 'serve a significant governmental interest.'" 104 S.Ct. at 3266–67 (quoting *Heffron,* 452 U.S. at 649, 101 S.Ct. at 2565). No reference is made to the requirement that the regulation be narrowly tailored. We decline to interpret *Regan* and *Heffron* as establishing a more lenient standard than that followed by the Court in other recent cases. Had the Court meant to alter the test which it had recognized only four days earlier in *Clark v. Community for Creative Non-Violence,* we believe that it would have done so in a more explicit fashion.

**82.** The "clearly erroneous" standard is set forth in FED.R.CIV.P. 52(a).

is legal: did the Park Service draft regulations that were "narrowly tailored to serve a significant governmental interest"? The *agency* in this case was the institution charged with the principal resolution of factual issues; the court's role was limited to determining whether the regulations which the agency adopted were within the boundaries of constitutionality prescribed by the first amendment. If they were, it is not the province of the court to "finetune" the regulations so as to institute the single regulatory option the court personally considers most desirable. Courts possess no particular expertise in the drafting of regulatory measures;[83] their role is to uphold regulations which are constitutional and to strike down those which are not.

Our analysis is informed by recent Supreme Court interpretations of the "narrowly tailored" requirement. In *Clark v. Community for Creative Non-Violence*[84] the Court upheld a Park Service regulation which prohibited camping in certain parks in Washington, D.C. The Service had used the regulation to deny plaintiffs' request for permission to sleep in Lafayette Park and the Mall as part of a vigil symbolizing the plight of the homeless in America. This court, sitting *en banc,* held by a six to five vote that application of the regulations so as to prevent sleeping in the parks would infringe the demonstrators' first amendment rights.[85]

The Supreme Court reversed.[86] Assuming but not deciding that sleep may be an expressive activity,[87] it noted the substantiality of the government's interest in "maintaining the parks in the heart of our capital in an attractive and intact condition."[88] It concluded that the Park Service regulation was a reasonable restriction on the time, place and manner of speech.[89] In doing so it criticized the majority of this court for second-guessing the Park Service's judgment:

> We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the government interest in preserving park lands. There is no gain-saying that preventing overnight sleeping will avoid a measure of actual or threatened damage to Lafayette Park and the Mall. The Court of Appeals' suggestion that the Park Service minimize the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage, whether by sleeping or otherwise, and these suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States v. O'Brien* or the time, place, and manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or

---

83. One reason for judicial lack of expertise: courts are not in a position to evaluate the feasibility of administration and enforcement of regulations, as are the agencies, who are therefore properly charged with drafting them. This is demonstrated by the impracticality of some of the "finetuning" done by the district court. *See, e.g., supra* note 34.

84. 104 S.Ct. 3065 (1984).

85. *Community for Creative Non-Violence v. Watt,* 703 F.2d 586 (1983) (en banc) (per curiam).

86. *Clark v. Community for Creative Non-Violence,* 104 S.Ct. 3065.

87. *Id.* at 3068–69.

88. *Id.* at 3070.

89. *Id.* at 3069–72; *see id.* at 3071 ("If the Government has a legitimate interest in ensuring that the National Parks are adequately protected, which we think it has, and if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment as a reasonable regulation on the manner in which a demonstration may be carried out.").

endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.[90]

In *Regan v. Time, Inc.*[91] the Court considered a federal statute which made criminal the publication of photographs of United States currency in color or within a specified size range. The Court upheld the color and size requirements as reasonable restrictions on speech.[92] In doing so Justice White and a plurality of the Court again rejected the notion that courts may arbitrarily substitute their judgment for that of legislative or administrative institutions:

> Time contends that although the color restriction serves the Government's interest in preventing counterfeiting, it is nonetheless invalid because it is not narrow enough. Time asserts that the color restriction applies to an illustration of currency regardless of its capacity to deceive and is thus broader than is necessary to achieve the Government's interest in preventing counterfeiting. However, Time places too narrow a construction on the Government's interest and too heavy a burden on those enacting time, place, and manner regulations.... It is ... sufficiently evident that the color limitation serves the Government's interest in a substantial way. That the limitations may apply to some photographs that are themselves of no use to counterfeiters does not invalidate the legislation. The less-restrictive-alternative analysis invoked by Time has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the color restriction substantially serves the Government's legitimate ends.[93]

Justice Stevens expressed a similar view in his concurrence:

> It may well be, as Time argues, that "Congress can do a much better job in preventing counterfeiting than the

---

**90.** *Id.* at 3072.

The concurrence-dissent relies on the brief passage in which the Court notes that proposed alternatives "would still curtail the total allowable expression in which demonstrators could engage." *Id.* at 3072, *quoted in* Op. at 1545. From this the concurrence-dissent concludes that *Clark* stands for the following proposition: "a challenger to a time, place, and manner restriction cannot win by merely conjuring up an alternative regulation that does not prohibit *its* conduct, regardless of the alternative regulation's effects on the expression of others." Op. at 1546 (emphasis in original). This interpretation is unnecessarily restrictive. There is nothing in Justice White's majority opinion to suggest that he intended the quoted passage to limit or qualify his analysis.

**91.** 104 S.Ct. 3262 (1984).

**92.** *Id.* at 3271–72. The Court struck down a provision which specified legitimate *purposes* for which photographs might be published. *Id.* at 3267.

**93.** *Id.* at 3271–72 (plurality).

The concurrence-dissent's interpretation of Justice White's opinion is unjustifiably narrow. Judge Wald contends that Justice White qualified his explicit rejection of less-restrictive-alternative analysis in a footnote, in which he wrote that "[i]f Time is exempted from the color requirement, so must all others who wish to use such reproductions. While Time may consistently use negatives and plates that are of little use to counterfeiters, there is no way of ensuring that others will adhere to that practice." *Id.* at 3272 n. 12. From this passage Judge Wald derives the principle that "[a] time, place, and manner regulation is not unconstitutional as applied to situations that do not threaten the governmental interest at stake if that application *is an unavoidable consequence of regulating other conduct that does threaten the interest at stake.*" Op. at 1544 (emphasis in original). According to the opinion, *Regan* stands for this and nothing more. What the opinion fails to mention, however, is that Justice White was merely applying in his footnote the familiar principle that "the effectiveness of [a] regulation should not be measured solely by the adverse consequences of exempting a particular plaintiff from the regulation." 104 S.Ct. at 3272 n. 12 (citing *Clark,* 104 S.Ct. 3065, 3070–71; *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 652–53, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981)). In short, Justice White's footnote does not limit or qualify his textual discussion because the two passages deal with completely different constitutional principles.

present § 474 and § 504," Br. for Appellee 46. The question for us, of course, is not whether Congress could have done a better job, but whether the job it did violates Time's right to free expression. It does not. . . . [94]

■ *Clark v. CCNV* and *Regan v. Time* clarify the respective institutional roles of administrators and judges. The expertise of administrators lies in selecting policy goals and in devising techniques with which to pursue them. In the course of performing their twin roles administrators consider evidence which is predominantly factual in nature. Such inquiries, however, seldom lead to a single, determinate result. More often they suggest a number of feasible alternatives, each of which is capable of accomplishing the agency's goals within acceptable parameters of accuracy and effectiveness. Where a regulation restricts the time, place or manner of speech, however, feasibility is not enough: the regulation must also satisfy the first amendment requirement that it be "narrowly tailored." The Supreme Court's test defines a subset of regulatory options which are both feasible *and* constitutional; it is within this zone of constitutionality that agencies are permitted to exercise discretion in selecting regulatory initiatives. [95]

■ The expertise of courts lies in determining whether an agency's decision is within the zone of constitutionality, not in choosing between options within that zone. [96] A court may not require that the agency adopt the "least restrictive alternative," thereby substituting its judgment for that of the regulators. [97] In short, if the regulation lies within the zone prescribed

---

**94.** 104 S.Ct. at 3296 (Stevens, J., concurring in part and dissenting in part).

**95.** Like the "zone of reasonableness" in administrative law, the zone of constitutionality is "an abstract quality represented by an area rather than a pinpoint." *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951).

**96.** Judge Wald praises the district court for engaging in a *de novo* review of factors underlying the challenged regulations. Such a review she finds consistent with this court's earlier decision in *A Quaker Action Group v. Morton,* 516 F.2d 717 (D.C.Cir.1975); *see* Op. at 1542–1543. Whether Judge Wald's reading of that case is correct or not, judicial review of time, place and manner restrictions must now proceed under the framework established by the Supreme Court in *Clark* and *Regan. See Clark,* 104 S.Ct. at 3072 (time, place, and manner decisions do not assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks), *quoted supra* pp. 1552–1553.

It is axiomatic that government regulations which restrict the exercise of free speech are subject to closer scrutiny than other types of administrative decisions, and that *courts,* not agencies, are the ultimate arbiters of constitutionality. It by no means follows, however, that courts are required or permitted to duplicate the extensive factual inquiries undertaken by agencies when they draft regulations. Not only is such duplication highly inefficient, it reflects a lack of judicial respect for the unique expertise of administrative agencies. The agency may as well not have engaged in exhaustive and detailed fact-finding if a court before which the agency's regulation is challenged takes it upon itself to do the same thing *de novo.*

**97.** We agree with Judge Wald that *Clark* and *Regan* "refine but do not revamp settled principles in first amendment law." Op. at 1542. What those decisions do is establish once and for all that least-restrictive-alternative analysis is not a part of the constitutional inquiry for determining the validity of time, place and manner restrictions. Because the Supreme Court has *never* considered that analysis to be an integral element of the constitutional test, *see Regan,* — U.S. —, 104 S.Ct. 3262, 3271–72, 82 L.Ed.2d 487 (plurality), *Clark* and *Regan* settle but do not revamp first amendment law. The "zone of constitutionality" analysis which we adopt today is nothing more or less than the doctrinal reverse of least-restrictive-alternative analysis. Only if one incorrectly assumes that the latter form of analysis was historically a part of the time, place and manner test can one conclude, as Judge Wald does, that our approach accords the government "greater latitude than previously to burden protected expression." Op. at 1542.

Judge Wald also contends that *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1984), sanctions the result reached by the district court in the present case. Op. at 1546. The challenged statute in *Grace* prohibited the "display [of] ... any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement," in the "Supreme Court Building or grounds." 40 U.S.C. § 13k (1982). The Supreme Court

by the first amendment it is constitutional and must be affirmed as such by a court before which it is challenged.

We turn, then, to an examination of the individual regulatory measures adopted by the Park Service, bearing in mind that the expertise of several federal agencies, including that of the Secret Service, contributed to their content.

## III. THE REGULATIONS

### A. *Sign Restrictions*

The first set of regulatory provisions governs the construction, size and use of signs carried on the White House sidewalk. They prohibit persons from

    a. leaning or attaching signs against the fence;

    b. demonstrating with signs that are not "attended," with attendance defined as the maintenance of physical contact;

    c. holding stationary signs closer than three feet to the fence;

    d. holding signs not made of cardboard, posterboard or cloth;

    e. holding signs larger than three feet in height, twenty feet in length, and one-quarter inch in thickness;

    f. using sign supports not made of wood with cross-sections larger than three-quarters of an inch by three-quarters of an inch.[98]

The district court permanently enjoined the enforcement of all but two of the sign provisions. It upheld the one-quarter inch limitation on the thickness of signs;[99] it also approved the requirement that signs be "attended," but redefined "attendance" to mean "within 5 feet of the persons responsible for controlling them."[100] Appellees defend the trial court's modification; appellants urge us to reinstate the original language.

While the Park Service advanced other governmental interests as a justification for the sign provisions,[101] it is clear that the principal interest they are designed to serve is that of presidential security. This court has described the safety of the Presi-

---

grounds encompassed, *inter alia,* the public sidewalks surrounding the Court building, *see* 40 U.S.C. § 13p (1982); those sidewalks are a public forum, *Grace,* 103 S.Ct. at 1708. Because the statutory restriction did not substantially serve the government's interests, the Court held that the statute was unconstitutional as applied to the sidewalks, *id.* at 1708–10, even though the statute did not specifically distinguish between the sidewalks and other parts of the Supreme Court grounds. Judge Wald's opinion equates the Court's decision in *Grace* to focus exclusively on public sidewalks with the district court's creation of a "five foot rule" for parcel and sign placement in the present case, concluding that "[i]f one was 'rewriting,' so was the other." Op. at 1547. This fails to appreciate, however, the crucial distinction between what the Supreme Court did in *Grace* and what the district court did here. The reason the *Grace* Court considered § 13k exclusively in the context of public sidewalks was that it could thereby avoid a needless constitutional inquiry into the status of the other parts of the Supreme Court grounds and building. There was no need to determine whether those areas were also public forums, because "the controversy presented by appellees concerned their right to use the *public sidewalks*." 103 S.Ct. at 1706 (emphasis added). Early in its opinion, therefore, the Court stated that it would "address only whether the pro-

scriptions of § 13k are constitutional as applied to the public sidewalks." *Id.*

It is beyond dispute that courts are permitted to assess the constitutionality of a statute or regulation by drawing distinctions that are not explicitly embraced within the text of the provision. What courts may *not* do is substitute their factual judgment for that of the politically responsible body when that institution's judgment lies within the parameters of first amendment constitutionality. The district court here did precisely that when it arbitrarily rewrote the Park Service's regulations. The difference between *Grace* and the district court's opinion is therefore not only great, it is of constitutional dimensions.

**98.** *See* 36 C.F.R. § 50.19(e)(9) (1983).

**99.** *White House Vigil for the ERA Comm. v. Clark,* No. 83–1243 (D.D.C. 26 Apr. 1984) (order).

**100.** *Id.*

**101.** 48 Fed.Reg. 28058, 28058 (1983). Those interests include pedestrian safety and traffic and the preservation of the White House view.

dent as a "paramount interest"; [102] we have held that the protection of the White House and its occupants justifies "a greater limitation than would be applicable generally to use of public streets and parks." [103]

Just as the White House area is a "unique situs" for first amendment activity,[104] it is also a unique situs for considerations of presidential and national security. Despite the significant amount of time modern Presidents spend travelling, they and their families are in residence at the White House far more than they are away. Not only the President, but the Vice-President, the White House Chief of Staff and other high Administration officials have their offices in the Mansion. The White House is the nerve center for America's national security network, with facilities for coordinating the activities of American diplomats, intelligence agents and military personnel around the globe. Indeed, it is not surprising that the "hot line" and the Situation Room, both located within the Mansion, have become two of the most evocative symbols of national security in an increasingly dangerous age of nuclear tension.

For a structure of such obvious significance to presidential and national security, the White House is singularly exposed to potential terrorist attack. It is located in the middle of a densely populated metropolitan area. A major thoroughfare, Pennsylvania Avenue, runs alongside the White House sidewalk, while busy E Street bounds the Mansion's lawn to the south. Although airplanes are legally prohibited from flying over the White House, the presence of the National Airport flyway a mile to the west presents a latent security danger. So, too, does the construction of tall office buildings within a few blocks of the Mansion.[105]

In short, the need for effective security in the vicinity of the White House is great, but the geographical position of the Mansion renders it inherently insecure. Several federal agencies have brought considerable experience and expertise to bear on the problem of White House security; the regulations challenged here are but one fruit of their endeavors.

■ Considered as part of a larger effort to safeguard the Mansion and its occupants, the sign provisions clearly represent an appropriate means of promoting the substantial governmental interest at stake. They are narrowly tailored to avert specific forms of terrorism.[106] Thus, the size limitations are designed to ensure that activities occurring on the sidewalk are not obstructed from police view. The interest at

**102.** *A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1117 (D.C.Cir.1969); *see also Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence"); *White House Vigil for the ERA Comm. v. Watt,* 717 F.2d 568, 570 (D.C.Cir. 1983) ("'peculiar sensitivity of ... the safety of the President'").

**103.** *A Quaker Action Group v. Morton,* 516 F.2d 717, 729 (D.C.Cir.1975).

**104.** *Id.* at 725.

**105.** The twelfth story of a recently-completed office building on 15th Street enjoys a "nearly unobstructed view" of the North Portico of the White House. Wash. Post, 12 Sept. 1984, at C6, col. 1. The Secret Service has reached an agreement with the building's developer which will permit the Service to post agents on the rooftop during special White House events and to oversee the building's security system. *Id.*

**106.** There is no suggestion, of course, that appellees or intervenors *themselves* would engage in activity that threatens the White House or its occupants. So far as the record shows, their demonstrations have always been conducted in a peaceful and orderly fashion. We are concerned instead with persons who harbor less beneficial intentions. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 652, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981) (justification for regulation should not be measured solely with regard to activities of persons before court).

stake is one which cannot be promoted solely through the assignment of additional police officers to the sidewalk: no matter how large the police presence, large signs make observation and communication among officers more difficult. The requirement that signs be constructed of non-rigid materials is designed to prevent them from being used to scale the White House fence, or turned upon police·officers or other demonstrators as weapons. The restriction on the composition of sign *supports* similarly prevents their use as weapons, either in hand-to-hand struggle or as a means of launching projectiles. The prohibition on the leaning of signs against the White House fence ensures that terrorists will not be able to hide explosives or other deadly objects in the triangular area between the sign and the fence ledge. Finally, the requirement that a demonstrator maintain physical contact with his or her sign is another means of ensuring that signs are not turned into weapons or used to conceal dangerous items.[107]

■ The measures adopted by the Park Service are clearly not the *only* means by which that agency could have sought to deter illegal activity on the sidewalk. There may even be options the Service rejected which would have promoted its interests in a more effective fashion. We are not at liberty, however, to replace the agency's judgment with our own. It is suffi-

cient that the means selected be "narrowly tailored": that they lie within the range of feasible options the agency was constitutionally permitted to consider. The sign provisions clearly satisfy this element of the time, place and manner test.

### B. *Center Zone Restriction*

The challenged regulations provide in part that

No signs or placards shall be held, placed or set down on the center portion of the White House sidewalk, comprising ten yards on either side of the center point on the sidewalk; Provided, however, that individuals may demonstrate while carrying signs on that portion of the sidewalk if they continue to move along the sidewalk.[108]

The asserted governmental interest in imposing additional restrictions for demonstrations within the "center zone" is that of preserving unimpaired the public's view of the Presidential Mansion from Pennsylvania Avenue and Lafayette Park.[109] No considerations of security or safety are at stake; the governmental interest derives wholly from aesthetic concerns.

It is well established that the government's power to regulate private affairs encompasses the power to promote aesthetic goals.[110] While judgments based on aesthetic considerations are inherently

---

**107.** The district court erred when it required the government to demonstrate a *"probable danger"* arising from the regulated activity. *White House Vigil for the ERA Comm. v. Clark*, No. 83–1243, slip op. at 18 (D.D.C. 26 Apr. 1984) (emphasis in original). Counsel for appellees conceded as much at oral argument. Agencies charged with the protection of the President must be permitted, within reason, to anticipate novel security threats and to act to avert them. Common sense and the experience of history recommend no less. *See A Quaker Action Group v. Morton*, 362 F.Supp. 1161, 1169 (D.D.C. 1973) ("No President was ever killed in a theatre until Lincoln, in a railway station until Garfield, in a reception line until McKinley, or in an open car until Kennedy."), *modified*, 516 F.2d 717 (D.C.Cir.1975).

**108.** 36 C.F.R. § 50.19(e)(9) (1983).

**109.** *See* 48 Fed.Reg. 28058, 28058 (1983). Tourists and passersby are not the only beneficiaries of the center zone restriction. To the extent the news media publishes or broadcasts images of the White House, millions of Americans benefit.

**110.** *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) ("It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.").

The governmental regulation of aesthetics has generated a considerable body of legal scholarship. Representative pieces include Anderson, *Architectural Controls*, 12 Syracuse L.Rev. 26 (1960); Aronovsky, Metromedia, Inc. v. City of San Diego: *Aesthetics, the First Amendment, and the Realities of Billboard Control*, 9 Ecology L.Q. 295 (1981); Bufford, *Beyond the Eye of the Be-*

more subjective than other types of decisions, they nonetheless reflect values of great significance in everyday life. A decision to ban all billboards from a residential neighborhood may be as important to the people who live there as the assignment of additional police officers to the area; the preservation of an historic building [111] may do more to enhance the quality of life in a city than the construction of a new freeway.

Recent decisions of the Supreme Court establish that aesthetic considerations may justify otherwise reasonable time, place and manner restrictions on speech.[112] Because the interests at stake are inherently

holder: *A New Majority of Jurisdictions Authorize Aesthetic Regulations,* 48 UMKC L.Rev. 125 (1980); Costonis, *Law and Aesthetics: A Critique and a Reformulation of the Dilemmas,* 80 Mich. L.Rev. 355 (1982); Crumplar, *Architectural Controls: Aesthetic Regulation of the Urban Environment,* 6 Urb.Law. 622 (1974); Dukeminier, *Zoning for Aesthetic Objectives: A Reappraisal,* 20 Law & Contemp.Probs. 218 (1955); Michelman, *Toward a Practical Standard for Aesthetic Regulation,* 15 Prac.Law. 36 (1969); Rowlett, *Aesthetic Regulation Under the Police Power: The New General Welfare and the Presumption of Constitutionality,* 7 Wake Forest L.Rev. 230 (1971); Williams, *Subjectivity, Expression, and Privacy: Problems of Aesthetic Regulation,* 62 Minn.L.Rev. 1 (1977); Comment, *Zoning, Aesthetics, and the First Amendment,* 64 Colum.L.Rev. 81 (1964); Comment, *The Reasonableness of Aesthetic Zoning in Florida: A Look Beyond the Police Power,* 10 Fla.St.U.L.Rev. 441 (1982); Note, *Aesthetics and the Constitution: Houston's Sign Ordinance,* 18 Hous.L.Rev. 629 (1981); Note, *Beyond the Eye of the Beholder: Aesthetics and Objectivity,* 71 Mich.L.Rev. 1438 (1973); Note, *Aesthetic Nuisance: An Emerging Cause of Action,* 45 N.Y. U.L.Rev. 1075 (1970); Note, *Architecture, Aesthetic Zoning, and the First Amendment,* 28 Stan.L. Rev. 179 (1975); Note, *Aesthetic Regulation and the First Amendment,* 3 Va.J.Nat.Resources L. 237 (1984).

**111.** *See generally* Note, *Local Historic Preservation Measures as an Alternative to Federal Preservation Efforts,* 3 Va.J.Nat.Resources L. 263 (1984) (recent survey of historic preservation cases).

**112.** In *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), the Court struck down a municipal ordinance which imposed strict prohibitions on the erection of outdoor billboards. All of the Justices agreed, however, that purely aesthetic considerations may justify restrictions on speech. 453 U.S. at 507–08, 510, 101 S.Ct. at 2892, 2893 (White, J., for the plurality); *id.* at 530–34, 101 S.Ct. at 2904–06 (Brennan, J., concurring in judgment); *id.* at 550, 551 n. 23, 552, 101 S.Ct. at 2914, 2915 n. 23, 2915 (Stevens, J., dissenting in part); *id.* at 559–61 (Burger, C.J., dissenting); *id.* at 570, 101 S.Ct. at 2924 (Rehnquist, J., dissenting).

The Court reaffirmed the proposition in *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). There it upheld a municipal ordinance prohibiting the posting of signs on public property. Justice Stevens wrote for the majority that

[t]he problem addressed by this ordinance— the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit. "[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect."

104 S.Ct. at 2130 (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976)).

Appellees attempt to distinguish *Taxpayers for Vincent* on the ground that it concerned the long-term display of unattended signs, rather than face-to-face communicative activity of the type involved here. It is true that Justice Stevens, in his majority opinion, used words to that effect in the course of distinguishing *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *see Taxpayers for Vincent,* 104 S.Ct. at 2131. The Court in *Schneider* struck down an ordinance that prohibited handbilling on the streets; it held that the municipality's aesthetic interest in avoiding litter could have been protected through an ordinance which penalized persons who actually litter. We believe, however, that the basis of Justice Stevens's discussion of *Schneider* is not the distinction urged by appellees, but rather the distinction *explicitly* adopted by the Justice in another passage of his opinion:

With respect to signs posted by appellees . . . it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. In *Schneider,* an anti-littering statute could have addressed the substantive evil without prohibiting expressive activity, whereas application of the prophylactic rule actually employed gratuitously infringed upon the right of an individual to communicate directly with a willing listener. Here, the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself. In contrast to *Schneider,* therefore, the application of ordinance in this case responds precisely to the substantive problem which legitimately concerns the City.

subjective, however, they must be "carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." [113]

We are convinced that the restriction challenged here does not mask constitutionally improper motives. Three factors are relevant to our analysis.

First, the government has regulated for the benefit of the *public* rather than for the promotion of its own aesthetic preferences. It is the view *of* the White House, *not from* it, which is being preserved. Whatever would be our ruling in the latter case, the purpose of the regulation here is clearly proper.

In order to establish the constitutionality of an aesthetic regulation of speech, the government must show that the regulation was enacted for purposes other than the effectuation of its drafters' personal tastes. Some resort must be had to societal preferences. To be sure, the preference ultimately embraced need not be that held by a majority of the populace. The government is entitled to rely on the expert judgment of artists, architects, urban planners, design consultants, historians, and other professionals; it is not limited to the prevailing style, but may embrace the innovative and the avantgarde. The aesthetic judgment it makes need not sit well with all citizens, for the debate sparked by an unconventional choice often leads to a richer and more complex appreciation of what is aesthetically pleasing.[114] In short, the government need not endorse that which is popular or prevalent, but it must always act on society's behalf rather than its own.[115]

Arbitrariness or capriciousness in the selection of aesthetic goals may indicate the presence of an impermissible motive either to enact the preferences of individual government officials or to burden unreasonably the exercise of free speech.[116] A requirement that all signs carried on the White House sidewalk be of a certain color, for example, would be suspect because it appears to serve no legitimate social interest in aesthetics. For similar reasons the center zone restriction would be suspect were it shown that the public regards the presence of stationary signs directly in front of the White House as aesthetically pleasing. This in essence is what appellees argue; they contend that for many tourists the "White House experience" includes the presence of stationary demonstrations in

---

The ordinance curtails no more speech than is necessary to accomplish its purpose. 104 S.Ct. at 2132. The visual blight in the present case is "created by the medium of expression itself"—stationary protests within the center zone, which obstruct the view of the White House and its grounds. The conduct addressed by the Park Service regulations is therefore more like that proscribed by the municipal ordinance in *Taxpayers for Vincent* than that proscribed by the ordinance in *Schneider.*

**113.** *Metromedia,* 453 U.S. at 510, 101 S.Ct. at 2894.

**114.** One notable example outside the first amendment context is the adoption of Maya Lin's design for the Vietnam Veterans' Memorial in Washington, D.C. *Compare* Wolfe, *Art Disputes War: The Battle of the Vietnam Memorial,* Wash.Post, 13 Oct. 1982, at B1, col. 4 (criticizing design), *with* Goldberger, *Vietnam Memorial: Questions of Architecture,* N.Y. Times, 7 Oct. 1982, at C25, col. 1 (praising design).

**115.** Judge Wald's opinion questions the utility of our distinction between aesthetic regulations which enact societal preferences and those which enact the preferences of individual government officials. Such a distinction, Judge Wald suggests, may run afoul of the principle that the first amendment protects unpopular minorities from the prejudices of hostile majorities. Op. at 1551. The approach we adopt today, however, is not blind to the fact that majority tastes sometimes mask disapproval of the substantive content of expressive activities. Our analysis does nothing to alter the familiar proscription of content-based restrictions. *See supra* pp. 1549–1550. That element of the constitutional test applies with unqualified force to government regulations which derive their ostensible legitimacy from the aesthetic preferences of popular majorities.

**116.** *See Metromedia,* 453 U.S. at 510, 101 S.Ct. at 2894 (one consideration is whether the aesthetic judgment is so unusual as to raise suspicions in itself).

the center portion of the sidewalk. This may be true, although *why* signs in the center zone as well as for more than a hundred yards on either side are essential for some visitors' "White House experience" has not been explained. As the public comments reveal, however, *many other* tourists believe that the proliferation of stationary signs within the center zone substantially detracts from their ability to view the White House and its grounds. The Park Service was therefore required to choose between two conflicting views of what is aesthetically pleasing.[117] Its decision to preserve twenty yards of the White House sidewalk was not unreasonable; the Service could conclude that most Americans share the latter aesthetic preference, and that stationary protests block more of the White House view than do mobile ones.[118] Far from being arbitrary, the Service's decision represented an exercise of informed discretion based upon what a sizable portion of society regarded as aesthetically significant.

The second factor we must consider in assessing the center zone restriction is the *extent* to which it burdens speech. The more restrictive an aesthetic regulation, the closer a court must look to determine if it is based on constitutionally improper motives.

The center zone restriction burdens speech only in an indirect and insubstantial way. Protestors are free to engage in a wide variety of expressive activities within the center zone; they are only precluded while there from engaging in stationary protest. The center zone occupies no more than seven percent of the total length of the sidewalk; protestors may remain stationary along any portion of the remainder.

Appellees contend, however, that the regulation makes it more difficult for them to attract media attention to their cause. They assert that the center zone of the sidewalk is a particularly evocative site for symbolic protest, and that stationary demonstrations there are given preferential coverage by the news media. To deny

117. "Aesthetically pleasing" in this context refers not so much to that which is considered visually beautiful as to that which promotes or enhances the cultural identity of an area. The debate over the "White House experience" is essentially a debate over cultural identity; as such, it is more susceptible to objective resolution than a disagreement over which of two views is more "pleasant" or "beautiful." *See* Costonis, *supra* note 110.

It is not at all clear why appellees and intervenors regard *stationary* protest within the center zone as essential to the White House experience. Surely the additional cultural significance of stationary protest over mobile protest is, at most, insignificant. The government's decision to allow only mobile protest within the zone enhances the White House experience for many (and perhaps most) tourists, while it diminishes that experience for other tourists in only an insubstantial and indirect fashion.

118. The concurrence-dissent contends that the center zone restriction is unnecessary to further the government's aesthetic interests; in doing so, however, the opinion seriously underestimates the degree to which stationary demonstrations within the center zone have the potential to obscure the view of the White House. While the size restrictions and the prohibition on unattended signs reduce that potential to some extent, a proliferation of hand-held signs

of legal dimensions may well obscure a significant portion of the White House view. For example, the height limitation applies only to signs themselves and not to their supports; some signs may therefore be considerably higher than others. Because different signs can obscure different *levels* of view, the cumulative effect may be to block vision for a significant range of height above the sidewalk. Such problems are far less pronounced when demonstrators are required to remain moving within the center zone: stationary signs have the potential of blocking considerably *more* of the White House view than do mobile signs.

Nor is it any mystery why the Park Service decided to allow non-stationary protests within the center zone, even though such protests will admittedly obscure *some* of the White House view. Assuming *arguendo* that a ban on non-stationary protests would have been constitutional, the effect of instituting such a ban would be to demarcate a "no man's land" in the middle of the sidewalk. Protestors on either side of the zone would have considerable difficulty communicating with one another, for they would be prohibited from carrying their signs across the demarcated area. The regulation the Park Service adopted represents a reasonable effort to accommodate the needs of such protestors.

them the opportunity to engage in such protest, they argue, is to deny them effective access to the media.

We find appellees' contentions unpersuasive for two reasons. First, the government introduced into evidence several photographs which show that the Mansion can clearly be seen from non-central locations on the sidewalk. Second, and more importantly, our caselaw does not recognize a constitutional right to attract media attention to one's cause. As this court stated in *Vietnam Veterans Against the War v. Morton*,[119] "What the litigant's press agent seeks and what the public interest requires differ widely. Although every man is entitled to make his remonstrance, no man is entitled to make such a remonstrance that it will be carried on all three television networks." [120]

The final consideration relevant to our analysis is that the center zone restriction is not an *isolated* attempt to regulate the aesthetics of the White House view. If it were we might engage in a more searching inquiry to ensure that the agency has regulated for genuinely aesthetic reasons and not for the purpose of curtailing protected expression. The regulation here, however, is but one element of a continuing effort by the Park Service to preserve and enhance the view of the White House for tourists and passersby. The White House and its grounds are maintained year-round in a scrupulously manicured condition; indeed, only this summer the north facade of the Mansion underwent extensive restoration. The White House lawn is designed and maintained such that tourists on the sidewalk are afforded an excellent view of the Mansion. The fence which separates the sidewalk from the White House grounds is designed to facilitate rather than obstruct that view. It is obvious that the Park Service has promoted, in a *number* of ways, the ability of Americans to enjoy the beauty of the White House and its grounds. The center zone restriction is only one example of the Service's commitment to aesthetic values and their effective implementation.[121]

■ We find no evidence that the center zone restriction was enacted for any purpose other than the preservation and enhancement of the White House view for tourists and passersby. Because the Park Service based its aesthetic judgment on societal preferences rather than the preferences of individual officials, because the regulation it adopted is not unduly restrictive of free expression, and because the regulation constitutes part of a comprehensive effort to preserve the aesthetics of the White House view, we conclude that the provision is constitutional.

### C.  *The Parcels Restriction*

The regulations provide that

**119.**  506 F.2d 53 (D.C.Cir.1974) (per curiam).

**120.**  *Id.* at 58; *see also Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (first amendment does not guarantee right to communicate one's views at all times and places or in any manner that may be desired); *Community for Creative Non-Violence v. Watt,* 703 F.2d 586, 618–19 (D.C.Cir.1983) (en banc) (Wilkey, J., dissenting) (first amendment does not guarantee right to deliver message in the most effective manner possible, nor does it guarantee media attention), *rev'd,* — U.S. —, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 474 (2d Cir.1980) (first amendment does not guarantee news publicity), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981); *Unit-*

ed States v. Kiger, 297 F.Supp. 339, 343–44 (S.D.N.Y.1969) (first amendment does not protect violation of a criminal statute in order to get one's views carried in the press and on the air), *aff'd per curiam,* 421 F.2d 1396 (2d Cir.), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970).

**121.**  The fact that the regulations permit stationary protest *outside* the center zone does not suggest that the center zone restriction is a regulatory aberration. The decision to set aside only the central twenty yards of the sidewalk represents a healthy compromise between the interests of those who wish to view the White House and those who wish to demonstrate on the sidewalk.

No parcel, container, package, bundle or other property shall be placed or stored on the White House sidewalk ... Provided, however, that such property, except structures, may be momentarily placed or set down in the immediate presence of the owner on those sidewalks.[122] The district court found this prohibition "clearly overbroad and unreasonable."[123] It rewrote the rule to provide that "parcels or other property be in the immediate presence of the owner, where 'immediate presence' shall be defined as within 5 feet of the owner."[124] Appellees urge this court to affirm the modifications.[125] They argue that the original provision makes it more difficult for protestors such as the elderly and handicapped, or mothers with small children, to take part in prolonged demonstrations. These protestors, they contend, must have available to them such items as medical supplies and infant necessities to be able to remain on the sidewalk for any extended period of time. The government, by contrast, seeks reinstatement of the original language.[126]

We are not entirely convinced that the first amendment protects the conduct proscribed by the parcels restriction.[127] That amendment only protects activity which may be fairly characterized as speech. Courts have correctly recognized that some forms of *conduct* are sufficiently expressive to warrant constitutional protection,[128] but by no means all conduct which is intended by the actor to express an idea is speech.[129] Intent is but one half the calculus;[130] a court must also consider whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."[131] Those types of conduct which the Supreme Court has held are within the ambit of the first amendment—most notably, demonstrating,[132] marching,[133] picketing,[134] wear-

---

**122.** 36 C.F.R. §§ 50.7(h)(2), 50.19(e)(10) (1983).

**123.** *White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 26 (D.D.C. 26 Apr. 1984).

**124.** *White House Vigil for the ERA Comm. v. Clark,* No. 83–1243 (D.D.C. 26 Apr. 1984) (order).

**125.** Brief of Appellees at 54. Appellees do not suggest that we invalidate the parcels restriction in its entirety; indeed, such an argument would run counter to their consistent reliance on Rule 52(a).

**126.** Brief for Appellants at 42–43.

**127.** Appellees concede that the first amendment is not *directly* implicated by the parcels restriction. *See* Brief of Appellees at 50 ("the mere carrying or setting down of parcels on the White House sidewalk may not itself be squarely within the protection of [the] First Amendment"). So, too, does the district court. *See White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 26 (D.D.C. 26 Apr. 1984) ("the placing of such containers on the sidewalk near a demonstrator cannot be characterized as a first amendment activity per se").

**128.** *See, e.g., Spence v. Washington,* 418 U.S. 405, 409–11, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d

842 (1974) (per curiam). A number of constitutional scholars have questioned the utility of a rigid distinction between speech and conduct. *See, e.g.,* Baker, *Scope of the First Amendment Freedom of Speech,* 25 U.C.L.A. L.Rev. 964, 1010 (1978); Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis,* 88 Harv.L.Rev. 1482, 1495 (1975); Henkin, *The Supreme Court, 1967 Term—Foreward: On Drawing Lines,* 82 Harv.L. Rev. 63, 79 (1968).

**129.** *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).

**130.** Moreover, the intent must be that of conveying a "particularized message." *Spence v. Washington,* 418 U.S. at 410–11, 94 S.Ct. at 2730.

**131.** *Id.* at 411, 94 S.Ct. at 2730.

**132.** *See, e.g., Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

**133.** *See, e.g., Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

**134.** *See, e.g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

ing armbands,[135] leafletting,[136] and affixing a peace symbol to the American flag[137]—clearly satisfy both the subjective and objective requirements of the constitutional test.[138]

By contrast, the activity at issue here—placing parcels on the sidewalk—appears to satisfy neither. Appellees have made no credible claim that such activity is "inten[ded] to convey a particularized message";[139] nor have they shown that onlookers would regard their conduct as communicative.[140] Parcels are, of course, inherently less expressive than signs; while the requirement that demonstrators maintain

physical contact with their signs directly implicates expressive activity, the parcels restriction does not.[141]

At most, the activity proscribed by the parcels restriction *facilitates* expression.[142] The first amendment protects facilitative activity only insofar as its restriction imposes burdens on expression itself.[143] Neither the Supreme Court nor the lower federal courts, however, have enunciated a test for determining *how substantial* a burden on expression is necessary before the first amendment is implicated.[144] While it is obvious that not just any minimal effect will do, this court is left without

---

**135.** *See, e.g., Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

**136.** *See, e.g., Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**137.** *See, e.g., Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam).

**138.** In *Community for Creative Non-Violence v. Watt,* 703 F.2d 586 (D.C.Cir.1983) (en banc) (per curiam), *rev'd,* —— U.S. ——, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), this court held that sleeping can, in certain circumstances, be "speech" within the meaning of the first amendment. The Supreme Court reversed on the grounds that the challenged regulation was a reasonable time, place and manner restriction. In doing so, the Court assumed, *but did not decide,* that sleeping may be expressive conduct. 104 S.Ct. at 3068–69. Because the Court was able to resolve the case on other grounds, the constitutional status of sleep remains uncertain. No matter how the issue is finally resolved, however, it is clear that the overnight sleeping at issue in *CCNV* lies much nearer the scope of constitutional protection than the placing of parcels on the White House sidewalk.

**139.** *Spence v. Washington,* 418 U.S. at 410–11, 94 S.Ct. at 2730.

**140.** *Id.* at 411, 94 S.Ct. at 2730. Onlookers would, of course, regard many *other* elements of the typical White House vigil as communicative. But the fact that demonstrating, chanting, or carrying signs is inherently expressive does not mean that the depositing of parcels on the sidewalks is as well. Because the regulations deal with segregable activities, so, too, must our analysis.

**141.** It is clear that the Park Service did not intend for the parcels restriction to apply to

signs or banners. *See White House Vigil for the ERA Comm. v. Watt,* No. 83–1243, slip op. at 6 n. 5 (D.D.C. 19 July 1983); 48 Fed.Reg. 28058, 28059 (1983). Demonstrators may place signs on the sidewalk so long as they maintain physical contact with them. *See* 36 C.F.R. § 50.-19(e)(9) (1983) (physical contact requirement).

Our decision should not be read as holding that activity of the type engaged in here is inherently non-expressive. In other circumstances the placing of items on the ground may be considered expression; we hold only that the demonstrators *here* have failed to establish the expressive content of their activity. *See Clark v. Community for Creative Non-Violence,* 104 S.Ct. at 3069 n. 5.

**142.** *Cf. id.* at 3070 ("[A]lthough we have assumed for present purposes that the sleeping banned in this case would have an expressive element, it is evident that its major value to this demonstration would be facilitative.").

**143.** This is a corollary of the principle that the first amendment protects *expression* rather than *all* human activities.

**144.** Justice Marshall proposed a test in his dissenting opinion in *Clark v. Community for Creative Non-Violence:* "[F]acilitative conduct that is *closely related* to expressive activity is itself protected by First Amendment considerations." 104 S.Ct. at 3077 n. 7 (Marshall, J., dissenting) (emphasis added). Besides the fact that Justice Marshall's test was proposed in *dissent* and therefore carries no precedential weight, a "close relationship" standard would be too amorphous for objective application. Moreover, Justice Marshall would apparently apply the first amendment to some restrictions of facilitative activity that have no effect on expression itself; this result runs counter to the fundamental principle that expression is what is protected by the first amendment.

guidance for determining whether the alleged burden in this case is sufficient to trigger constitutional protection.

█ It is unnecessary for us to resolve this potentially thorny issue, however, because the parcels restriction clearly survives scrutiny under the reasonable time, place and manner test. The provision is narrowly tailored to address a security problem of the greatest magnitude, that of parcels left unattended on the White House sidewalk. Because any such parcel *could* contain an explosive device, all unattended parcels must be regarded as potentially suspect.[145]

The fact that the regulation limits the "nature, extent [or] duration" of demonstrations conducted on the White House sidewalk does not necessarily render it unconstitutional;[146] the burden it imposes on expression must be weighed against the government's substantial interest in presidential security and the safety of persons on the sidewalk. It is clear that the elderly, the handicapped and infirm, and those with young children to care for will still be able to engage in protest despite the regulation. Organizations (such as NOW) which stage vigils of extended duration will, in many instances, be able to accommodate the special needs of such participants through the use of "facilitators."[147] Such persons can supply demonstrators with the items they require either by carrying the items on their person or by bringing them across Pennsylvania Avenue from Lafayette Park. Even if an organization does not use facilitators or if a demonstrator is engaged in a lone vigil, we are convinced that protest of a meaningful duration will remain possible for any persons who would have been able to demonstrate before adoption of the regulations.

## Conclusion

The regulations challenged here reflect the same variety of reasoned decisionmaking approved of by the Supreme Court in *Clark v. Community for Creative Non-Violence* and *Regan v. Time*. It is not the prerogative of this or any other court to question regulatory provisions affecting the time, place and manner of speech which lie within the zone of constitutionality prescribed by the first amendment. While the temptation to engage in judicial rulemaking may be powerful, our Constitution is best preserved by adherence to the proper judicial role.

*Reversed.*

WALD, Circuit Judge, concurring in the judgment in part and dissenting in part:

These cases are never easy. The nation has a paramount interest in the safety of its President, and judges must respect the experience and knowledge of the law enforcement agencies charged with protecting the President, his family, and others who live and work in the White House. In reviewing decisions about their security we must proceed with care.

---

**145.** The district court's modification, allowing parcels to be placed on the sidewalk if the owner remains within five feet of them, must be rejected not only because it constitutes impermissible "finetuning" of the regulatory mechanism, but also because it is *more arbitrary* and *less effective* than the original provision. A rule which prohibits *any* deposit of parcels on the sidewalk, except momentarily, is capable of being easily enforced. It requires the presence of a relatively small number of police officers, thereby avoiding the perception that the White House is an "armed enclave." Most importantly, it establishes a clear, bright line rule that does not lend itself to arbitrary or discriminatory enforcement.

By contrast, the district court's modification would be difficult to enforce in an effective and even-handed manner. It would require police officers to ascertain both whether a parcel is located within five feet of a demonstrator and whether that demonstrator is its "owner." One envisions a contingent of Park Police with tape measures in hand, dutifully attempting to comply with the district court's order.

**146.** *See Clark v. Community for Creative Non-Violence,* 104 S.Ct. at 3070–71.

**147.** *See* Collins Tr. at 76, 127–32 (use of facilitators by NOW).

Nonetheless, our duty requires us ultimately to weigh for ourselves the merits of a first amendment challenge to agency regulations in this sensitive area. The appellees in this case, all of whom frequently demonstrate on the White House sidewalk, argue that the government has needlessly infringed their right "peaceably to assemble, and to petition the Government for a redress of grievances" at this center of executive power, and the district court sustained that view. While I agree with the majority that most of the Park Service regulations are not unconstitutional as written, in my view the majority opinion does not adequately dignify the constitutional interests at stake in this claim, and does not examine those interests with sufficient particularity. The majority tautologically informs us that if a regulation "lies within the zone prescribed by the first amendment it is constitutional," Maj. Op. at 1532, but unfortunately tells us very little about where the boundaries of that "zone" are found.

Prior cases of the Supreme Court and this court concerning time, place, and manner restrictions do not permit such uncritical deference to agency decisionmaking. Because we are deciding the content of constitutional principles with significant effect on future cases, I believe our differences merit the discussion that follows.

## I. THE LEGAL STANDARDS

I have problems with the majority's legal analysis in three respects. First, I believe it discounts the district court's primary obligation to do the constitutional balancing for itself, and as a result overrates the appropriate scope of our appellate review. Second, it does not heed closely enough the requirement that time, place, and manner restrictions be "narrowly tailored." Recent Supreme Court cases on which the majority relies expressly reaffirm this test. Yet I read in the majority opinion hints that the government—as a result of those cases—now has greater latitude than previously to burden protected expression. As I parse those cases, however, they refine but do not revamp settled principles in first amendment law that govern our decision here. Finally, I disagree with the majority's analysis of the limited responses available to federal judges when they decide regulations are unconstitutional in part.

### A

The majority explains its refusal to review the district court's findings under the usual Fed.R.Civ.P. 52 "clearly erroneous" standard by asserting that

> The issue for decision on this appeal is not factual, it is legal: did the Park Service draft regulations that were "narrowly tailored to serve a significant government interest"? The *agency* in this case was the institution charged with the principal resolution of factual issues; the court's role was limited to determining whether the regulations which the agency adopted were within the boundaries of constitutionality prescribed by the first amendment.

Maj. Op., text at n. 83 (emphasis in original). The majority appears to reason that (1) the district court should have reviewed agency factfinding under a more deferential standard; (2) the district court's own "findings" are really conclusions of law, since it had no independent factfinding responsibility; and (3) therefore those "findings" are reviewable on appeal under the liberal standard for assessing legal error. I do not agree that this is an accurate statement of what a trial or appellate judge's responsibility is in such cases.

Judge Leventhal offered a balanced appraisal of judicial responsibility in first amendment cases.

> [T]his case is not a normal review of an executive action or administrative proceeding. When the executive or the administrative process abridges constitutional rights, it is subject to closer scrutiny than otherwise, and ultimately it is

the court rather than the agency that must balance the competing interests. The question in this case is not whether some support for the regulations may be adduced, by reference to evidence in the record and a claim of reasonable inferences or concerns, but is whether the regulations at issue here are "unnecessarily restrictive for the purpose they are designed to serve."

We now have ... a judicial determination based upon factual evidence adduced at a trial, indeed at a rather extensive and complete trial. To this determination we owe greater deference than to the untested administrative judgments with which we have been previously confronted. This decision being appealed was rendered by a district judge after consideration of both constitutional considerations, for which a judge has special concern, and the security considerations brought forward by the government officials. Moreover, the district judge had the benefit of the live testimony of the various witnesses whose assertions could be tested and probed on cross-examination. Thus, unless we discern clear error in the district court's findings of fact, or a mistake in its legal approach, we have no warrant for reversal.

*A Quaker Action Group v. Morton*, 516 F.2d 717, 723–24 (D.C.Cir.1975) (footnote omitted) (quoting *A Quaker Action Group v. Morton*, 460 F.2d 854, 860 (D.C.Cir. 1971)); *see also Women Strike for Peace v. Morton*, 472 F.2d 1273, 1289 (D.C.Cir.1972) (opinion of Wright, J.).[1]

In this case, the district court conducted a trial *de novo*, during which it exhaustively reviewed evidence relevant to the constitutionality of the regulations, including evidence offered by the governmental agencies. It was required to give the government's witnesses the attention their expertise warranted. But that evidence still had to undergo the judge's independent appraisal and judgment, and his factual findings deserve our approval unless clearly erroneous.

**B**

As the majority rightly notes, time, place, and manner restrictions must be justified without regard to the content of the message expressed; must be narrowly tailored to serve a significant government interest; and must leave open ample alternative channels of communication. *See, e.g., Clark v. Community for Creative Non-Violence*, —— U.S. ——, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). The crux of this case involves the second element of the test.

*United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), required that the incidental restrictions a regulation imposes on protected expression be no broader than is essential to the furtherance of the governmental interest at stake. *Id.* at 382, 88 S.Ct. at 1681.[2] That standard has been further broken down into two subsidiary inquiries. First, the challenged regulation must not unnecessarily contain provisions that entirely fail to advance the relevant governmental interest. If a regulation prohibits an identifiable class of expressive activity that does not pose any threat of the evil against which the regulation is directed, the courts will declare the

---

**1.** *See also Pullman-Standard v. Swint*, 456 U.S. 273, 285–88, 102 S.Ct. 1781, 1788–89, 72 L.Ed.2d 66 (1982) (reaffirming doctrine that factual findings, including findings on so-called "ultimate" facts, are reviewable on appeal only under "clearly erroneous" standard). Some constitutional questions, however, present special problems. *Cf. Bose Corp. v. Consumers Union*, —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

**2.** *O'Brien* concerned a restriction on what was arguably symbolic speech. *See* 391 U.S. at 376–77, 88 S.Ct. at 1678–79. However, the Supreme Court has held that the *O'Brien* standard governs time, place, and manner restrictions as well. *See Clark v. Community for Creative Non-Violence*, —— U.S. ——, 104 S.Ct. 3065, 3071 & n. 8, 82 L.Ed.2d 221 (1984); *id.* 104 S.Ct. at 3076 n. 6 (Marshall, J., dissenting).

regulation unconstitutional as it applies to that class of expression. *See* Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482, 1485–90 (1975).

The second aspect of *O'Brien*'s "narrow tailoring" requirement looks to see if an alternative regulation would serve the government's interest nearly as efficiently but would be demonstrably less intrusive on protected expression. Of course, any regulation could be made a little less intrusive on speech, at the cost of a little more protection for first amendment concerns. In this case, for example, adding six inches to the maximum permissible sign dimensions would surrender some marginal protection for security interests for a marginal benefit to free expression, but this sort of whittling is not what the "narrowly tailored" requirement is about. Instead, the court must look to see if the burden on speech is approaching an unreasonable level, or a serious loss to speech is being imposed for a disproportionately small governmental gain.[3]

The government here offers two purposes for its regulations: a compelling interest involving security of the White House occupants and the law enforcement officers and individuals on its sidewalks, and a more limited aesthetic interest in an unobstructed view of the White House for visitors.

Before considering the regulations in detail, however, I want to register my disagreement with an insistent theme in the majority opinion that the Supreme Court's recent decisions have changed the character or the mood of appropriate judicial scrutiny for time, place, and manner restric-

tions. *See, e.g.*, Maj. Op., text at n. 95. I believe those decisions are consistent with the *O'Brien* framework outlined above.

The recent Supreme Court pronouncements in *Clark v. Community for Creative Non-Violence,* —— U.S. ——, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) and *Regan v. Time, Inc.,* —— U.S. ——, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), emphasize that a time, place, and manner regulation is not unconstitutional simply because some alternative regulation would, *on the facts of the case before the court,* satisfy the government's aims equally well and yet not restrict the expressive rights of that particular challenger. *Regan* yields a corollary to that principle: A time, place, and manner regulation is not unconstitutional as applied to situations that do not threaten the governmental interest at stake if that application *is an unavoidable consequence of regulating other conduct that does threaten the interest at stake.* In other words, if a regulation cannot reasonably be drafted so as to prohibit all the conduct the state really needs to suppress, without marginally prohibiting some expressive activity that is harmless, it will pass muster. It seems to me the majority's approach to interpreting *Clark* and *Regan* blurs these well-defined principles into a far more diffuse deference to the government.

In *Clark,* demonstrators for the homeless challenged the constitutionality of a Park Service regulation forbidding overnight camping in the park. The Court rejected the argument that the Park Service should be required to adopt some other regulatory scheme to protect the parklands from overuse without forbidding sleeping by those demonstrators, such as restricting the size, duration, or frequency of demon-

---

**3.** The handbilling cases are the classic examples: banning the public distribution of leaflets is an effective method of litter control, but its high cost to free speech and the existence of feasible alternatives, such as a prohibition on littering itself, make the tradeoff impermissible. *See, e.g., Schneider v. State*, 308 U.S. 147, 161–62, 60 S.Ct. 146, 150–51, 84 L.Ed. 155 (1939); *see also*

*Schad v. Mount Ephraim*, 452 U.S. 61, 67–71 & 70 n. 8, 101 S.Ct. 2176, 2181–84 & 2183 n. 8, 68 L.Ed.2d 671 (1981) (discussing cases). These cases are also discussed in Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482, 1485–90 (1975).

strations. The Court observed that such measures "would still curtail the total allowable expression in which demonstrators could engage, whether by sleeping or otherwise," and concluded that "these suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained." *Id.* 104 S.Ct. at 3072. The proposed alternative regulations were less speech-restrictive on the facts presented in *Clark;* but viewed more generally, they were simply another regulatory scheme that would have allowed more expressive activity in some situations, and less expressive activity in others.

In *Regan,* Time magazine challenged an anti-counterfeiting statute prohibiting, among other things, reproducing United States currency in color. *See id.* 104 S.Ct. at 3264–65 (quoting 18 U.S.C. § 474 ¶ 6, § 504). The Court rejected Time's arguments that the color ban was too broad because it included photographs so distorted that they were entirely incapable of aiding counterfeiting. *Id.* at 3274 & nn. 14–15.

Writing for a plurality of four, Justice White commented:

That the limitations may apply to some photographs that are themselves of no

use to counterfeiters does not invalidate the legislation. The less-restrictive-alternative analysis invoked by Time has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the color restriction substantially serves the Government's legitimate ends.

*Id.* at 3271–72 (footnote omitted). In a footnote to this paragraph, Justice White stated that "[i]f Time is exempted from the color requirement, so must all others who wish to use such reproductions. While Time may consistently use negatives and plates that are of little use to counterfeiters, there is no way of ensuring that others will adhere to that practice." *Id.* at 3272 n. 12.[4] In sustaining the color provision, Justice White thus relied on the notion that the government could not frame a narrower statute that adequately protected against the evil to be prevented.[5]

It is crucial, I believe, to consider the exact context in which Justice White wrote his rejection of least speech-restrictive analysis in time, place, and manner restrictions. In *Regan,* because no alternative was available that could have prohibited only the speech that the government had a legitimate interest in suppressing, the Court ruled the statute could be enforced

---

4. The majority thinks that Justice White's footnote is unrelated to his rejection of less-restrictive-alternative analysis. *See* Maj.Op. at n. 93. I disagree.

   In the footnote, Justice White was responding to Justice Brennan's suggestion that "the particular negatives and plates used by Time would be of little assistance to counterfeiters," *Regan,* 104 S.Ct. at 3272 n. 12 (opinion of White, J.)—an argument that was basically a variation of the less-restrictive-alternative analysis urged by Time. Justice White argued that exempting Time would require the government to exempt all those who wanted to engage in similar expression, including expression that might assist counterfeiters. But if exempting Time and all those similarly situated would *not* have impaired the governmental interest at stake, Justice White's rationale would logically have required invalidation of the statute, as applied to

that class of expression. For the statute would not then have "substantially serve[d] the Government's legitimate ends," *id.* at 3272, no matter how much unrelated, harmful conduct it prohibited.

5. Justice Stevens, who added the decisive fifth vote to uphold the color and size provisions, argued even more emphatically that Time's publication of highly distorted images could assist counterfeiters. *See Regan,* 104 S.Ct. at 3294–96 (Stevens, J., concurring in the judgment in part and dissenting in part). Since his views limit the holding of the case, *Regan* clearly cannot be read to establish that a regulation that burdens protected expression more broadly than necessary is constitutional merely because some other part of the regulation is genuinely addressed to a legitimate objective.

in *all* its applications.[6] *Clark* ruled that a challenger to a time, place, and manner restriction cannot win by merely conjuring up an alternative regulation that does not prohibit *its* conduct, regardless of the alternative regulation's effects on the expression of others. Seen in that light, the basic structure of the *O'Brien* test is still alive and well, and must be applied to these regulations.

## C

The majority informs us that "it is not the province of the court to 'finetune' the regulations so as to institute the single regulatory option the court personally considers most desirable," and that the role of courts "is to uphold regulations which are constitutional and to strike down those which are not." Maj. Op., text at n. 83. Based on these unexceptionable generalizations, the majority expresses disapproval that "not only did [the district court] uphold some restrictions and reject others, it modified the content of individual provisions." Maj.Op., text at n. 32; *see also id.* n. 97. I do not share in that disapproval, for it seems to me the district court did exactly what it had to, assuming that its judgment of partial unconstitutionality was a correct one. The trial judge here simply

indicated at what point he believed a regulation strayed over the bounds of constitutionality. In so doing he did not "rewrite" the regulation, but only elucidated what the results of his constitutional balancing permitted. The agency is always free to withdraw the regulations altogether rather than amend or apply them to conform to his views. Indeed, it can prepare new and different ones. The trial court's judgment is a clearcut one—that the regulation as written is or is not constitutional or that it may be applied to some but not other situations. For example, in *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1984), the Supreme Court considered the constitutionality of a statute barring certain demonstrations in the Supreme Court building or on its grounds, which included the surrounding sidewalks. The statute did not distinguish between the Supreme Court sidewalk and the rest of the building grounds, but the Court had no difficulty in finding the statute unconstitutional only as it applied to the sidewalk. *See id.* 103 S.Ct. at 1706, 1710.[7] Here, the district judge declared the parcels and sign attendance regulations unconstitutional as they applied to parcels and signs within five feet of the person owning or controlling them, but otherwise constitutional. *See White House Vigil for the ERA Com-*

---

**6.** *Regan* suggests an important difference between the narrowly-tailored requirement of *O'Brien*, and less-restrictive-alternative analysis as applied to first amendment cases that do not involve time, place, and manner restrictions. *Cf. Schad v. Mount Ephraim*, 452 U.S. 61, 69 n. 7, 101 S.Ct. 2176, 2183 n. 7, 68 L.Ed.2d 671 (1981) (suggesting that lower demands apply to time, place, and manner restrictions). Ordinarily, a law that, at the margins, regulates some harmless protected expression may not constitutionally be enforced against that expression, even if this excessive scope is insignificant enough so that the law escapes facial invalidation as overbroad. *See generally New York v. Ferber*, 458 U.S. 747, 767–74, 102 S.Ct. 3348, 3360–63, 73 L.Ed.2d 1113 (1982). In the view of the *Regan* plurality, a time, place, and manner restriction that unavoidably and very marginally regulates harmless expression may be enforced against that expression.

**7.** The challengers in *Grace* sought only to demonstrate on the sidewalk, and the Court there-

fore had no occasion to rule on the constitutionality of the statute as it applied to other parts of the building and grounds. *See* 103 S.Ct. at 1706. However, the Court's rationale centered on the public character of the sidewalk and the harmlessness of the prohibited activities when conducted there. *See id.* at 1708–10. Obviously, quite different considerations would apply to enforcement of the statute against, for example, demonstrations inside the building. *Grace* certainly did not foreclose enforcement of the statute in such a case, as it would have if courts were really empowered only "to uphold regulations [or statutes] which are constitutional and to strike down those which are not." Maj.Op., text at n. 83. My point is that courts may—and traditionally do—find regulations valid as applied to some situations and invalid as applied to others, which is all the district court did in this case.

*mittee v. Clark,* No. 83–1243 (D.D.C. Apr. 26, 1984) (order). If one was "rewriting," so was the other. I believe both courts were acting in time-honored fashion to decide whether the unconstitutional portion of a statute can be pared away without unduly disrupting the intended regulatory plan.

## II. THE REGULATIONS

### A

The first group of contested regulations concern the material, size, and placement of signs on the White House sidewalk. The regulations provide that:

> No signs or placards shall be permitted on the White House sidewalk except those made of cardboard, posterboard or cloth having dimensions no greater than three feet in width, twenty feet in length, and one-quarter inch in thickness. No supports shall be permitted for signs or placards except those made of wood having cross-sectional dimensions no greater than three-quarter of an inch by three-quarter of an inch. Stationary signs or placards shall be no closer than three feet from the White House sidewalk fence. All signs and placards shall be attended at all times that they remain on the White House sidewalk. Signs or placards shall be considered to be attended only when they are in physical contact with a person. No signs or placards shall be tied, fastened, or otherwise attached to or leaned against the White House fence, lamp posts or other structures on the White House sidewalk.

36 C.F.R. § 50.19(e)(9) (1983).

According to the demonstators, the main problem with the "materials" provision, requiring all signs to be made of cardboard, posterboard, or cloth, is that it bans plywood signs which are more sturdy and durable and pose no security hazards. The

government said that plywood signs could be used to scale the White House fence or as shields or weapons in fights, and that splinters from such signs would be dangerous in the event of an explosion.

After considering the evidence, the district court found that, given its decision to uphold the regulation limiting the thickness of all signs to one-fourth inch,

> The total ban on signs made of wood is unjustified. It appears clear to the court that any sign with a thickness not exceeding ¼ inch, including one made of wood, would be of no assistance to anyone bent upon scaling the fence. As a matter of fact, it would be an impediment and utterly foolhardy for one to attempt to make use of such a sign for that purpose. *Contrary testimony is incredible.* The possibility that sheet explosives might be concealed in wooden signs is adequately dealt with by the thickness requirement of not more than ¼ inch on all signs. The testimony is that the thinnest sheet explosive is itself ¼ inch, and that a sign of that thickness regardless of its composition has no capacity to conceal such explosives.

*White House Vigil for the ERA Committee v. Clark,* No. 83–1243, slip op. at 23–24 (D.D.C. Apr. 26, 1984) (emphasis added). The district court also found no evidence that any sign had ever been used to scale the White House fence, and that in any event it can be—and has been—readily scaled without the assistance of a flimsy plywood sheet. *See id.* at 22–23. After a careful review of the evidence, I cannot see any grounds for overriding the district court's conclusion that based on weight and credibility of the testimony, as well as undisputed historical facts, the government made out no case that plywood signs, one-fourth inch thick, posed a danger to the security of White House occupants.[8] The potential use of plywood signs as weapons

---

**8.** The Assistant Director of Protective Research for the Secret Service testified that plywood could be used to scale the fence, and he stated that one person had used plywood to do so.

and the minimization of flying debris in an explosion involve security on the sidewalk itself. While that interest is certainly a legitimate one, it is far from unique to the White House sidewalk. The government's evidence on any special sidewalk dangers of plywood signs, as opposed to those made of plexiglass, was entirely speculative and not sufficient to overcome the appellees' considerable testimony that cloth and cardboard signs would not withstand prolonged use and would collapse or disintegrate in bad weather.[9] I therefore agree with the district court that the government's evidence failed to establish any significant relationship between its interest in maintaining order on the sidewalk and this part of the materials ban. Because in this instance the regulation prohibits a discrete, readily segregated class of expressive activity, *i.e.*, the display of plywood signs that present no adequately documented danger to the interests asserted by the government, I would uphold the trial court's ruling that the materials ban is unconstitutional as applied to plywood signs.

On the other hand, I agree with the majority that the restriction on size and placement of signs and on the type of sign supports deserved to be upheld. The district court invalidated the restriction on large signs on the ground that the Secret Service can adequately survey crowds on

Parr Tr., R. 162 at 53. However, later questioning by the court suggested that the single episode in question apparently involved a "structure," *see id.* at 73, and not a simple plywood sheet. *Cf.* Defendant's Exhibit MMM, Joint Appendix at 264 (Secret Service report on event referring to "structure"). The Assistant Director stated that about sixty people had gotten over the fence during the previous couple of years, and that no other person had used a sign or structure. Parr, R. 162 at 87. He agreed that the White House fence was constructed so that it was almost a ladder. *Id.* at 67.

The Assistant Director did testify that he might utilize a plywood sheet in attempting to scale the fence

"[i]f I was more athletic than I am right now, your honor. But I think I could use [the sheet]. Plywood is incredibly resilient, and it would probably bend before it would break, and all you would have to do is get one handhold on the top of that fence and be vaulted over, if you got a running jump, especially if you had a nice ramp to it.... Well, if you went back to Pennsylvania Avenue and ran toward this ramp effect here, it would probably bend in the middle, and you could get a handhold and be right over that fence."

Parr Tr., R. 162 at 70–72. It was evidently this testimony that the judge disbelieved.

The plaintiffs introduced a plywood sheet in evidence, Plaintiffs' Exhibit 133, which the judge was able to inspect. *See* R. 162 at 74 (recording receipt). The Assistant Director also told the district judge that the Secret Service would know immediately if someone jumped the fence even if no officer was watching, Parr Tr., R. 162 at 83, that the Secret Service is perfectly able to respond if someone does get over the fence, *id.* at 84, and that a concealed "counter-sniper" is always stationed so that he could shoot a fence-jumper if necessary, *id.* A government witness testified that plexiglass signs had caused problems in demonstrations on the sidewalk, *see* Lindsey Tr., R. 162 at 163–64, but no episodes involving plywood were described.

9. The Park Service official responsible for park police operations in the District of Columbia expressed general concern about the use of rigid signs as weapons or shields, *see* Lindsey Tr., R. 162 at 163–64, Pegula Dep., R. 195 at 15–16. The single episode he described in which rigid signs were so used involved plexiglass signs. *See* Lindsey Tr., R. 162 at 163.

Appellee Picciotto testified that cardboard or cloth signs cannot stand up under the long hours of use her vigil on the sidewalk requires; particularly in bad weather, such signs are difficult to control and likely to be destroyed. *See* Picciotto Tr., R. 157A at 48–49; Picciotto Tr., R. 170 at 134–35, 161–62.

In essence, neither side disputes the evidence offered by the other; instead, dispute centers on whether the clear burden on speech is offset by the marginal increase in security on the sidewalk. In my view, it is not. This regulation differs from, for example, the sign support regulation in that (1) law enforcement officers testified to the actual use of thick wooden dowels as weapons, *see* Lindsey Tr., R. 162 at 165–66, but did not do so as to plywood signs; (2) a demonstrator wielding a two-by-four is a good deal more dangerous than one with a thin plywood sheet; and (3) banners of the maximum size allowed can be adequately supported with the permitted wooden supports, *see infra* note 11, but demonstrators for whom long-term presence on the sidewalk is a part of their message must use plywood signs or face the constant destruction of signs made from less permanent materials.

the sidewalk through elevated observation posts and closed circuit television cameras. *See White House Vigil for the ERA Committee v. Clark*, No. 83–1243, slip op. at 21–22 (D.D.C. Apr. 26, 1984). Law enforcement officers testified that while a few large signs might not create a security hazard, many of them would obscure the ability of officers patrolling on the sidewalk to observe the activities of persons in front of the White House. *See, e.g.*, Lindsey Tr., R. 162 at 164–65, 233–36. Even accepting the district court's conclusion that demonstrators' signs would not block perusal of the sidewalk from other vantage points, I nonetheless believe the district court gave too little weight to the government's legitimate interest in assuring that the officers actually on the scene—those making immediate decisions about crowd management, rather than those on platforms or watching television monitors— also be aware of what is going on. *Cf. White House Vigil for the ERA Committee v. Watt*, 717 F.2d 568, 572 (D.C.Cir. 1983) (discussing dangers of very large signs). This interest also implicates building security to some degree, since the government seeks to *prevent* the firing of any dangerous objects towards the White House, not merely to observe it. Those in the best position to act immediately will often be the sidewalk officers. Finally, this regulation does not by itself impose an overwhelming burden on expression: a banner measuring three feet by twenty feet is a large and very visible one by most viewers' standards.

Sign supports are restricted to those no larger than three-quarters of an inch by three-quarters of an inch and made of wood. Government security experts testified that the commonly used aluminum hollow tubular sign supports could be used to fire projectiles or conceal explosives. *See* Parr Tr., R. 163 at 35–37. This testimony was somewhat undercut by other testimony that the smallest rocket launcher now developed is substantially larger than the largest support authorized by the regulation. Nonetheless, the regulation was not designed to protect against projectile danger alone. Considering the stakes at issue, the district court failed to adequately credit the government's interest in preventing serious harm. The danger that hollow supports might conceal potential weapons like blast marbles and flares, possibly even explosives, was, according to the testimony, a more realistic concern.[10]

In addition, concerns that large supports could be used as weapons have prompted the District of Columbia to regulate the size of sign supports on the public streets, and that danger must be taken into account here as well. *See* Hensdill Dep., R. 145D at 63–64. The testimony did show that the regulation would inconvenience some demonstrators. Large banners can more easily be displayed with stronger supports.[11] But even crediting all of the appellees' evidence, as the district court apparently did, I do not think that the burden this regulation imposes on expression outweighs the dangers the regulation addresses.

The regulations also ban stationary signs within three feet of the White House fence and attaching signs to, or leaning signs against, the fence or other structures on

---

10. *See* Lindsey Tr., R. 162 at 166 (recounting episode in which demonstrators "started dropping flares out of the hollow tubing, plus other materials that were used against [the] officers. They lit the flares and threw them at us, along with crimped nails, marbles, and a few other items."). Appellees argue that these items could easily be concealed on the person of demonstrators, but common sense suggests that hollow tubing could enable demonstrators to carry a greater number of dangerous objects more easily.

11. Plaintiffs' expert witness on flags testified that a cloth banner of the maximum permissible size supported only by two persons might sag in the middle, and that demonstrators might break the supports in an effort to hold the banner aloft. *See* Christianson Tr., R. 179 at 12–14, 20–22. However, the same expert also agreed that a banner of that size, if supported in the middle as well as at the ends, could effectively displayed. *See id.* at 8, 24.

the White House sidewalk. The justification for these regulations is that signs close to the fence create a triangular space bounded by the sidewalk, the solid ledge at the base of the White House fence, and the sign, in which explosives or contraband could be concealed. *See, e.g.,* Parr Tr., R. 162 at 52–53. The government's principal expert witness on security matters admitted that the three-foot regulation bans some conduct that presents no threat to security, such as simply holding a sign aloft in the zone without obscuring the area under the ledge.[12] But the government claimed that a regulation requiring signs to be held aloft in this area would require continuous surveillance of each demonstrator,[13] and would likely require frequent admonitions from police officers to enforce, possibly precipitating confrontations between demonstrators and police.

The challengers alleged substantial burdens stemming from the placement restrictions. They prevented demonstrators with signs but not others from sitting on the ledge, whether or not the signs are located in a way that enables anyone to conceal objects behind them.

A regulation is valid even if it unavoidably prohibits harmless conduct in order to cover similar but dangerous conduct. Despite qualms, I believe that on essentially undisputed facts, the government showed that the three-foot regulation was directed to a substantial danger, and that a narrower regulation might well be less effective because of difficulties with its enforcement. For me, however, the question is a very close one.

I have less trouble with the leaning ban. Appellees urge that police officers could look around signs, moving leaning signs to inspect beneath them, or use mechanical devices and dogs to "sniff" for explosives. But that answer does not seem adequate under the *O'Brien-Clark* test where a substantial harm is shown.

Finally, the government supports its regulation requiring that signs be attended at all times by arguing that unattended signs create an opportunity for others to place explosives in or under them. The district court's factual findings on this issue are unclear,[14] but it recognized the substantiality of the government's concern by upholding the regulation to the extent of requiring that demonstrators remain within five feet of their signs. The government objects to this compromise, pointing out that in a crowd, police officers cannot quickly determine what sign belongs to what individual. The district court's resolution might work well most of the time, but serious harm could be threatened where a large crowd on the sidewalk made it impossible to identify a sign owner within five feet. The government is entitled to promulgate regulations broad enough to reach all instances in which a grave danger is threatened, even though they incidentally affect speech. On that principle this regulation may be sustained.

### B

The center zone restriction provides:

> within three feet of the ledge who did not at one moment obscure any area under the ledge might quickly and entirely innocently change position or location so as to create a visual obstacle. *Cf.* Parr Tr., R. 162 at 61.

---

**12.** *See* Parr Tr., R. 162 at 61. The government's witness characterized the three-foot limit as "arbitrary," *id.* at 60, but he followed that comment by observing that "[w]e could have four feet, we could have one foot." Any linedrawing in this area necessarily has an arbitrary element.

**13.** The district court invalidated the three-foot restriction at least in part based on the possibility of this less restrictive alternative. *See White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 21, 24 (D.D.C. Apr. 26, 1984). However, security officials testified to their preference for regulations that do not require frequent interference with demonstrations, *see* Lindsey Tr., R. 162 at 167, and a demonstrator

**14.** *See White House Vigil for the ERA Comm. v. Clark,* No. 83–1243, slip op. at 24 (D.D.C. April 26, 1984) (categorically stating that "[t]he requirement that a demonstrator maintain contact with a sign is oppressive, and has little or nothing to do with security of any other government interest").

No signs or placards shall be held, placed or set down on the center portion of the White House sidewalk, comprising ten yards on either side of the center point of the sidewalk; Provided, however, that individuals may demonstrate while carrying signs on that portion of the sidewalk if they continue to move along the sidewalk.

36 C.F.R. § 50.19(e)(9) (1983).

I have no quarrel with the majority's view that aesthetic concerns may justify some time, place, and manner restrictions on expression. However, it is equally clear that courts must be especially careful in scrutinizing restrictions on first amendment expression that the government seeks to justify on eye-pleasing grounds. Aesthetic concerns will in close cases involving first amendments rights weigh in at a lower poundage than, say, public safety or national security considerations. Because of their subjective nature, aesthetic concerns are easily manipulated, and not generally susceptible of objective proof. The danger is not just, as the majority suggests, that government might adopt an aesthetic rationale as a pretext for an impermissible motive, but rather that so many forms of robust expression are by their very nature boisterous, untidy, unsightly, and downright unpleasant for unsympathetic viewers. Distaste for the vigor with which a message is asserted can too easily be cast as an aesthetic interest in compelling others to be more moderate and decorous—and, in consequence, less effective—in conveying their message.

If, as I agree, aesthetics are nonetheless to be recognized as legitimate governmental objectives, we must face squarely the implications of applying them to first amendment cases. The government has justified its 20-yard picture window regulation by citing the aesthetic interests of the visiting public in being able to see and photograph the White House against a tranquil foreground. The majority upholds this regulation in part because the government has regulated in accordance with the public's aesthetic views, not just its own. I am not entirely sure of the utility of this distinction in first amendment analysis, in light of that amendment's traditional function of protecting unpopular minorities against majoritarian excesses. But in this case, the government has an obvious interest of its own: its natural ambivalence toward the existence of vociferous demonstrators at the very gates of the White House, attracting news coverage and often raising unwelcome complaints about administration policies. We must therefore examine the government's asserted purpose and the efficacy of this regulation in satisfying that purpose with particular care.

The evidence showed that the main complaints from members of the public involved the proliferation of large, billboard-like signs left for extensive periods propped up against the White House fence. Under separate portions of the regulations upheld today, that complaint is assuaged; the maximum vertical dimension of signs is now three feet, and signs cannot be left unattended or leaned against the fence.[15] Photographs submitted by the government show that the view of the White House from the street is not seriously obscured by demonstrators with signs of these modest dimensions. *See* Defendants' Exhibits AAAA(1)–(14), Joint Appendix at 332–45. There was also evidence that demonstrators are generally cooperative in moving out of the way if tourists want to take unobstructed photographs. But most perplexing, the twenty-yard zone is closed only

15. The majority says that even signs three feet high can be held "at different levels." Maj.Op. at n. 118. This is true, of course, but it scarcely establishes that such signs so held will create a visual obstruction anywhere near as formidable as that which previously might have been possible. Actually, there is no evidence in the record to back up the majority's concern that large numbers of demonstrators frequently block the view in this way. The government does not, I believe, have as much leeway in regulating for the "worst case" scenario based on aesthetic concerns as it is granted when security is at stake.

to stationary demonstrators with signs, not moving demonstrators carrying the same signs, although the latter could surely block as much of the view as much of the time.[16] I agree with the district judge that in the aggregate, the evidence does not come near to demonstrating that a prohibition on stationary signs of the kind allowed under the new regulations will add discernibly to aesthetic enjoyment of the White House. To the extent that ordinary visitors carrying possessions who stop within this zone obstruct the view as much as demonstrators, the regulation moves perilously close to selectively penalizing those who visit the White House for the purpose of political demonstrations.

On the other hand, the record revealed that the regulation does impose a real burden on demonstrators. The majority brushes away their concerns with the declaration that there is no first amendment right to media attention, but I do not think that is the pertinent inquiry. When government bans stationary demonstrators from one section of a uniquely important public forum, it has obviously burdened their speech rights. If, as the district court found on ample evidence, the media are most likely to cover a demonstration in the center zone, then that fact is relevant in determining the extent of the burden and the need for its justification. It is not that protesters have an absolute right to the prime spot, but that the government must have an acceptable reason for excluding them from it or regulating the way they protest in it, and the means it chooses to implement its goal must be geared to achieve that end. The restriction on stationary as opposed to moving demonstrators, on the basis of aesthetics alone, does not, in my view, meet these requirements of the "narrowly tailored" test.

### C

The parcels regulation provides that:

> No parcel, container, package, bundle or other property shall be placed or stored on the White House sidewalk ... Provided, however, that such property, except structures, may be momentarily placed or set down in the immediate presence of the owner on those sidewalks.

36 C.F.R. § 50.19(e)(10) (1983). While not deciding the issue, the majority expresses doubt that "the first amendment protects the conduct proscribed by the parcels regulation." Maj. Op., text at n. 127. I believe it does.

As a general matter, carrying parcels is not, of course, "speech" within the meaning of the first amendment. However, the conduct this regulation prohibits not only arises in the immediate course of a demonstration, but according to the district court is necessary if some demonstrators are to convey their messages at all. *See White House Vigil for the ERA Committee v. Clark*, No. 83–1243, slip op. at 26 (D.D.C. Apr. 26, 1984). A regulation on facilitative conduct that cuts off or sharply restricts expression itself certainly burdens that expression.

I do not think we are required to ignore the fundamental proposition that it is people, with the basic needs of people, who exercise first amendment rights. Practically, old people, handicapped persons, mothers with children and children's paraphernalia, and even young and unencumbered demonstrators can demonstrate or distribute literature only for limited periods if they are not permitted to put down their possessions more than "momentarily." A demonstration is not some kind of ritualistic marathon dance, the prize dependent on how long a participant can stay on her feet and moving. In the trial below, an organizer for the White House Vigil for the ERA Committee testified that as a result of the parcel regulation, the Vigil had been forced

---

**16.** The majority observes that a total ban on sign-carrying demonstrators in the center zone would make it difficult for protesters to get from one side of the zone to the other. *See* Maj.Op. at n. 118. This may be so, but it is largely irrelevant. The question is whether the regulation as presently written significantly advances the purpose claimed for it.

to curtail the distribution of leaflets and petitions. According to the organizer, carrying literature, petitions, and clipboards on which people could sign the petitions, as well as banners, poles, and personal belongings on one's person at all times, simply proved too burdensome. *See* Beall Tr., R. 170 at 121–22. Since organizers were not certain how many people would attend each demonstration, *see id.*, it became difficult to gauge how much material to bring. We evidenced similar concerns about the effect of the regulation on distribution of leaflets in our opinion directing modification of the preliminary injunction. *See White House Vigil for the ERA Committee v. Watt,* 717 F.2d 568, 570 (D.C.Cir. 1983).

The first amendment looks to realities, not mere formalities. Justice Marshall, dissenting in *Clark,* said:

> [F]acilitative conduct that is closely related to expressive activity is itself protected by First Amendment considerations.... [T]hat linkage, itself "suffices to require a genuine effort to balance the demonstrators' interests against other concerns for which the government bears responsibility."

*Clark v. Community for Creative Non-Violence,* — U.S. —, 104 S.Ct. 3065, 3077 n. 7, 82 L.Ed.2d 221 (1984) (Marshall, J., dissenting) (quoting *Community for Creative Non-Violence v. Watt,* 703 F.2d 586, 607 (1983) (Ginsburg, J., concurring in the judgment)).[17] The government "cannot foreclose the exercise of constitutional rights by mere labels," *NAACP v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963), and neither should it be able to lower the level of scrutiny of a law

that directly and substantially abridges protected expression by calling it "facilitative." If the first amendment does not permit the government to impose unreasonable restrictions on leafletting, surely it cannot suppress the same expression by over-regulating conduct that "facilitates" leafletting. Otherwise, government could more easily discourage the presence of people at a demonstration than regulate the signs they carry. A demonstrator forbidden to set down a receptacle in which leaflets are carried for more than a moment may lack the endurance to leaflet at all, or to do so for any appreciable time.

In other contexts, the Supreme Court has recognized that the first amendment requires attentive concern with protecting the conditions that are necessary for effective communication. Thus, the amendment offers protection against undue financial burdens on expression, *see Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (newspaper taxation); *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (contributions to political committees concerned with referendum votes); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (campaign expenditures), as well as restrictions on access to certain highly newsworthy events, *see Globe Newspaper Co. v. Superior Court for Norfolk,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (criminal trials); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (same), and impermissible discrimination among ideas disseminated through public education, *see Board of*

---

**17.** Bafflingly, the majority concludes that Justice Marshall would "apparently apply the first amendment to some restrictions of facilitative activity that have no effect on expression itself." Maj.Op. at n. 144. I can find nothing in his opinion to support such an inference.

The *Clark* Court commented that the main value of sleeping in the park "would be facilitative." 104 S.Ct. at 3070. It did so, however, in the course of explaining that the kind of demonstration sleep would facilitate—prolonged demonstrations that might damage the park—was exactly the kind of demonstration the Park Service had a legitimate interest in regulating. Despite the discussion in the dissent and in the opinions in the court of appeals, the Supreme Court conspicuously declined to make any broad statement about the application of the first amendment to regulations of facilitative conduct.

*Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) (removal of books from school library). *See generally Richmond Newspapers,* 448 U.S. at 584, 100 S.Ct. at 2831 (Brennan, J., concurring in the judgment). These cases, while obviously not controlling here, nevertheless suggest that the burdens of the parcel regulation should not be too casually dismissed in this case on the ground that they do not concern "speech." "[I]n an area so closely touching our most precious freedoms," *NAACP v. Button,* 371 U.S. at 438, 83 S.Ct. at 340, the definition of what impedes freedom of expression must be a pragmatic one. The imposition of a substantial, direct, and immediate burden on expression should be sufficient to invoke first amendment analysis.[18]

So viewed, I do not believe the parcels regulation can be sustained. This regulation is clearly not a broad rule that, in only a small portion of its applications, has incidental effects on expression. Its application is limited to a public forum of unique national significance. Although its terms literally affect all visitors to the White House sidewalk, it will plainly have its major impact on political demonstrators who stay on the sidewalk for extended periods in order to demonstrate. Moreover, it was promulgated as part of a regulating plan targeted at expressive activities, and the burden it imposes on demonstrators must be considered not only individually but cumulatively in light of the other burdens that will be imposed by dint of these regulations on expression in the same forum.

As discussed above, the impact of this regulation will be substantial. The majority rationalizes that demonstrators can now keep their parcels across the street in Lafayette Park, *see* Maj.Op., text at n. 147, but even if this is feasible in group demonstrations, a bar against putting down personal or demonstration-related possessions for more than an instant at a time still represents a substantial burden, in some cases an impossible one, for individual demonstrators.

The government's security experts testified that explosives can be concealed in abandoned parcels. *See, e.g.,* Parr Tr., R. 162 at 117–19; Jones Dep., R. 193 at 62–64. The district court acknowledged the possibility but held this danger could be adequately dealt with by a less restrictive mandate that individuals remain within five feet of any parcels placed on the sidewalk. The government countered that in a large crowd law enforcement officers might not be able to identify the owners of parcels or even tell whether the owners were present within the five-foot zone.

Viewing the evidence offered by government security experts deferentially, it is still not apparent why a parcel on the ground is more dangerous than one held in the hand, provided that its owner is in immediate physical contact with it. Continuous physical contact is, after all, considered sufficiently safe for the care of signs under these regulations; it is unclear why it would not also suffice with parcels. The majority opinion may consider this "rewriting" the regulation, but I view it as in accord with a "narrowly tailored" *O'Brien* analysis that will not allow a regulation if it prohibits an identifiable, readily segregated class of conduct with no demonstrated relationship to the governmental purpose asserted. In my judgment, the parcels requirement, as written, violates that fundamental principle. It substantially im-

---

18. The majority is uncertain *"how substantial* a burden on expression is necessary before the first amendment is implicated." Maj.Op., text at n. 144 (emphasis in original) (footnote omitted). In my view, the parcels regulation imposes a burden well beyond any reasonable threshold, and I therefore need not decide precisely where the threshold is. Certainly a regulation of facilitative conduct need not absolutely bar expres-

sion in order to trigger first amendment concerns. In evaluating time, place, and manner restrictions, courts are traditionally called upon to weigh the substantiality of the burden a regulation imposes on speech. I would adapt the analysis developed in those cases in determining when the burden a facilitative regulation imposes on speech is substantial.

plicates a type of first amendment conduct that does not, on the evidence submitted, pose any genuine threat to the security of the White House.

CONCLUSION

I am concerned that the majority rationale defers too much to agency determinations and does not credit enough the district court's time-honored function of reviewing the government's evidence and making the primary balancing between its interests and first amendment protections. I agree, however, that many of these regulations meet the *O'Brien* "narrowly tailored" test and should be upheld. I respectfully dissent from the decision to uphold the materials regulation as applied to plywood signs, and the center zone and parcels regulations, as written.